KCEHLOCO

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

1199SEIU UNITED HEALTHCARE
WORKERS EAST,

        Petitioner,

      v.                  20 Civ. 3611 (JGK)

PSC COMMUNITY SERVICES,

                         Oral Argument

        Respondent.

------------------------------x
ALVARO RAMIREZ GUZMAN, et al.,

        Plaintiffs,

      v.                  20 Civ. 3929 (JGK)

THE FIRST CHINESE PRESBYTARIAN
COMMUNITY AFFAIRS HOME
ATTENDANT CORPORATION,

        Respondent.

------------------------------x
EUGENIA BARAHONA ALVARADO, ,

        Plaintiff,

      v.                  20 Civ. 3930 (JGK)

ALLIANCE FOR HEALTH,

        Defendant.

------------------------------x

                         New York, New York
                         December 14, 2020
                         2:30 p.m.

Before:

            HON. JOHN G. KOELTL,

                         District Judge

KCEHLOCO

<pre>
 1                            APPEARANCES
                            (via telephone)
 2

 3   GLADSTEIN REIF AND MEGINNISS, LLP
          Attorneys for Petitioner 1199
 4   BY:  JAMES MICHAEL REIF

 5   LEVY RATNER, P.C.
          Attorneys for Petitioner 1199
 6   BY:  LAUREVE DANIELE BLACKSTONE
          ALEXIS I. LEHMANN
 7
     BOND, SCHOENECK & KING, PLLC
 8        Attorneys for Respondent PSC
     BY:  MICHAEL PATRICK COLLINS
 9        MALLORY CAMPBELL

10   EPSTEIN BECKER & GREEN
          Attorneys for Respondent New Partners
11   BY:  PATRICK G. BRADY

12   FORDHARRISON LLP
          Attorneys for Respondent Stella Orton Homcare, Ricmond,
13   Sunnyside, Family Home Care, Care at Home
     BY:  PHILIP K. DAVIDOFF
14
     HOGAN LOVELLS US LLP
15        Attorneys for Respondent Chinese-American Planning
     Council, United Jewis Council
16   BY:  KENNETH HAROLD KIRSCHNER
          DAVID JUSTIN BARON
17
     JACKSON LEWIS PC
18        Attorneys for Respondent First Chinese Presbyterian, Azor
     Home Care, Bushwick Stuyvesant Heights Home, CABS Homecare,
19   Riverspring, St. Nicholas, and Wartburg
     BY:  DOUGLAS JOSEPH KLEIN
20        RYAN CHRISTOPHER CHAPOTEAU

21   LITTLER MENDELSON, P.C.
          Attorneys for Respondent Region Care, Inc.
22   BY:  LISA GRIFFITH

23   JACKSON LEWIS PC
          Attorneys for Respondent Alliance for Health and
24   AccentCare
     BY:  FELICE B. EKELMAN
25
</pre>

KCEHLOCO

APPEARANCES (Cont'd)
(via telephone)

PECKAR & ABRAMSON, P.C.
    Attorneys for Respondent Prestige Home Care, Prestige Home
Attendants d/b/a All Season Home Attendants, and Personal Touch
Home Care of New York,
BY:  SHANNON DANIELLE AZZARO

PUTNEY TWOMBLY HALL & HIRSON, LLP
    Attorneys for Respondent Priority Home Care and Premier
Home Health Care
BY:  REBECCA KIM KIMURA

VIRGINIA & AMBINDER, LLP
    Attorneys for the Plaintiffs in the Guzman and Alvarado
mattes and Interested Parties in 1199SEIU matter
BY:  LaDONNA LUSHER
     MICHELE MORENO

BORRELLI & ASSOCIATES, P.L.L.C
    Attorneys for the Interested Party Mercedes Pena
BY:  MICHAEL R. MINKOFF

FISHER TAUBENFELD LLP
    Attorneys for Intervenor CPC and UJC intervenors
BY:  MICHAEL TAUBENFELD
     -and-
TAKE ROOT JUSTICE
BY:  SUMANTRA TITO SINHA

KCEHLOCO

1          (The Court and all parties present telephonically)

2          THE COURT:  Good afternoon, everyone.

3          Mr. Rossner, call the cases, please.  There are three

4     of them.

5          THE LAW CLERK:  Yes.  This is 1199SEIU United

6     Healthcare Workers East v. PSC Community Services, *et al.*,

7     20 Civ. 3611; Guzman*, et al.* v. the Chinese Presbyterian

8     Community Affairs Home Attendant Corporation, 20 Civ. 3929; and

9     Alvarado v. Alliance for Health Inc., 20 Civ. 3930.

10         THE COURT:  OK.  And 1199, who is appearing for the

11    plaintiff, or petitioner?

12         MS. BLACKSTONE:  Good afternoon, your Honor.  This is

13    Laureve Blackstone from Levy Ratner for petitioner 1199.

14         THE COURT:  OK.

15         MR. REIF:  Also on the line for 1199, James Reif

16    Gladstein Reif & Meginniss.

17         MS. LEHMANN:  And Kimberly Lehmann, Levy Ratner, 1199.

18         THE COURT:  There are numerous respondents.  Briefly

19    tell me who you all are.  PSC Community Services.

20         MR. COLLINS:  This is Michael Collins from Bond

21    Schoeneck & King, along with Mallory Campbell of the same firm,

22    for PSC Community Services.  Good afternoon, your Honor.

23         THE COURT:  Good afternoon.

24         New Partners, Inc.

25         MR. BRADY:  Good afternoon, your Honor.  Patrick G.

KCEHLOCO

1    Brady, Epstein Becker & Green.

2              THE COURT:  Stella Orton Home Care Agency.

3              MR. DAVIDOFF:  Good afternoon.  Phil Davidoff from

4    FordHarrison for Stella Orton and also the next five on the

5    caption, next five agencies.

6              THE COURT:  OK.  Thank you very much.

7              Chinese-American Planning Council.

8              MR. KIRSCHNER:  Ken Kirschner and David Baron from

9    Hogan Lovells for Chinese-American Planning Council and United

10   Jewish Council of the East Side.

11             THE COURT:  First Chinese Presbyterian Community

12   Affairs Home Attendant Corp.

13             MR. KLEIN:  Good afternoon, your Honor.  Douglas Klein

14   and Ryan Chapoteau from Jackson Lewis, and our office is also

15   representing Azor, Bushwick Stuyvesant, CABS, Riverspring,

16   St. Nicholas, and Wartburg.

17             THE COURT:  Alliance for health.

18             MS. EKELMAN:  Your Honor, so Felice Ekelman, also from

19   Jackson Lewis for Alliance for Health and AccentCare.

20             THE COURT:  OK.  Region Care.

21             MS. GRIFFITH:  Lisa Griffith from Littler Mendelson

22   for Region Care.  Good afternoon, your Honor.

23             THE COURT:  Good afternoon.

24             Prestige Home.

25             A VOICE:  On behalf of Prestige Home Care, Prestige

KCEHLOCO

Home Attendants d/b/a All Season Home Attendants, and Personal

Touch Home Care of New York, Shannon Azzaro from Peckar &

Abramson.

THE COURT:  Great.  Priority Home Services.

MS. KIMURA:  Good afternoon, your Honor.  Rebecca

Kimura with Putney Twombly Hall & Hirson, also representing

Premier Home Health Care Services, Inc.

THE COURT:  All right.  AccentCare, I think you've

already appeared.  Go ahead, though.

MS. EKELMAN:  We have.

THE COURT:  All right.  There's been a series of

interested parties, including Gail Yan.

MS. LUSHER:  Good afternoon, your Honor.  LaDonna

Lusher and Michele Moreno of Virginia & Ambinder.

THE COURT:  OK.  There's also Ms. Pena, separately

represented.

MR. MINKOFF:  Good afternoon, your Honor.  This is

Michael Minkoff of Borrelli & Associates on behalf of Mercedes

Pena.

THE COURT:  OK.  CPC intervenors, I think, right?

MR. TAUBENFELD:  Yes, your Honor.  This is Michael

Taubenfeld from Fisher Taubenfeld, along with Tito Sinha from

TakeRoot Justice.  We represent the CPC proposed intervenors

and the UJC proposed intervenors.

THE COURT:  Great.  The parties in the Guzman case.

KCEHLOCO

1        MS. LUSHER:  Good afternoon, your Honor.  You have

2   LaDonna Lusher and Michele Moreno, Virginia & Ambinder, for the

3   plaintiffs in the Guzman action and also the plaintiffs in the

4   Alvarado action.

5        THE COURT:  OK.  And the defendant?

6        MR. KLEIN:  Good afternoon again, your Honor.  Douglas

7   Klein and Ryan Chapoteau is on the line for Jackson Lewis for

8   First Chinese.

9        MS. EKELMAN:  For alliance for health, your Honor, you

10  have Felice Ekelman and Ryan Chapoteau on the line for the

11  defendants, also from Jackson Lewis.

12       THE COURT:  And the union, is the union a party to

13  the --

14       MS. BLACKSTONE:  No, your Honor.

15       THE COURT:  OK.

16       MS. BLACKSTONE:  The union is not a party.

17       THE COURT:  Before you speak, please tell us who you

18  are.

19       MS. BLACKSTONE:  That was Laureve Blackstone, counsel

20  for petitioner, stating that the union is not a party in the

21  Guzman and Alvarado related matters.

22       THE COURT:  All right.  I have a series of motions

23  before me and a petition, so let me explain how I wish to

24  proceed.

25       First, I'll talk to the union, 1199, and I'll have

KCEHLOCO

1    various questions.  I'll turn then to interested party Gail Yan

2    and to the proposed intervenors, the CPC and UJC intervenors.

3    I'll talk to them first about procedural matters and then turn

4    to the merits that they've raised.  Then I'll turn to the

5    Guzman and Alvarado matters and the motions to remand.

6          So let me start with 1199.  Now, let me ask you some

7    preliminary questions, and then I'm perfectly happy to listen

8    to you briefly before I turn to some of the questions that have

9    been raised on the papers.

10         Initially, you have a petition to confirm the

11   preliminary arbitration award, and there are responses from

12   many of the respondents.  Is that petition now ripe for me to

13   decide?  Do you want me to issue a decision as to whether to

14   confirm the arbitration award or decline to confirm the

15   arbitration award?

16         The reason I ask that question is the initial petition

17   to confirm the arbitration award has been somewhat taken over

18   by the various motions and papers that have been filed, but the

19   initial petition and memo in support of the petition and the

20   answers by the respondents are out there.  So is it the union's

21   position that I ought to confirm the preliminary arbitration

22   award?

23         MS. BLACKSTONE:  Your Honor, this is Laureve

24   Blackstone for the petitioner, 1199.

25         Yes, it is the union's position and the union's

KCEHLOCO

1    petition, and the union is seeking for the Court to confirm the

2    arbitration award.

3         THE COURT:  OK.  The arbitration award actually has

4    six separate ordering paragraphs in the award, including the

5    issues of justiciability for arbitrability and who should

6    decide down to the question of my office will contact the

7    parties to arrange arbitration of this matter on the merits

8    subject to the limits set forth in numbers 3, 4, and 5.

9         Are you asking me to confirm all six items in the

10   award?

11        MS. BLACKSTONE:  Your Honor, this is Laureve

12   Blackstone for the petitioner.

13        No we are not.  We are only seeking confirmation as to

14   the arbitrator's rulings with respect to arbitrability and

15   jurisdiction.  I can point you to the petitioner's memorandum

16   of law which, I think, clarifies that we are not moving for

17   confirmation with respect to the arbitrator's other

18   determinations.

19        THE COURT:  OK.  So items one and two of the award?

20        MS. BLACKSTONE:  Correct.

21        THE COURT:  OK.  What is the current state of the

22   arbitration?

23        MS. BLACKSTONE:  Sure.  This is Laureve Blackstone

24   again for the petitioner.

25        The arbitration is in the discovery phase.  There have

KCEHLOCO

1   been two subsequent orders of the arbitrator ordering

2   discovery, ordering the respondents to produce various items,

3   and production has begun of those quite voluminous items.  We

4   anticipate that hearing on the merits will proceed early next

5   year.

6            THE COURT:  So January?  February?  March?  Do you

7   have a schedule?

8            MS. BLACKSTONE:  We do not have a schedule, your

9   Honor.

10           THE COURT:  Am I correct if I add up those who have

11   appeared in this matter or several matters who have raised

12   objections, if you will, to the items one and two of the

13   arbitration award, there are about 14 or so people who have

14   shown up in these proceedings?

15           MS. BLACKSTONE:  Your Honor, this is Laureve

16   Blackstone again.

17           I thought the number was 12, but 12 or 14, yes,

18   correct, who have raised objections.

19           THE COURT:  And the union seeks to represent about

20   100,000 employees or former employees of the respondents?

21           MS. BLACKSTONE:  That's correct, your Honor.

22           THE COURT:  OK.  So before I turn to what I see as the

23   major issues that have been raised, namely, finality,

24   *Rooker-Feldman*, and the merits of the arbitrator's decision,

25   I'm familiar with the papers.  I'm prepared to listen to you

KCEHLOCO

for anything that you would like to tell me briefly about your

position, and then I'll ask you some specific questions on

those specific items that I've already mentioned.

So Ms. Blackstone.

MS. BLACKSTONE:  Thank you, your Honor.  I'll just

briefly make a few points.  Of course, I'm happy --

THE COURT:  If you wish.

MS. BLACKSTONE:  I do.

As you noted moments ago, what's before this Court and

what commenced this proceeding is the union's petition to

confirm an award which finally determines arbitrability and

jurisdiction, and the question before the Court is whether to

confirm.  In doing so, the Court's review is highly

circumscribed and deferential, and that's driven by the fact

that it's an arbitration award interpreting a collective

bargaining agreement.  The arbitrator determined his

jurisdiction over the union's claims.  Those claims arose

during bargaining unit members' employment, and his conclusion

on arbitrability and jurisdiction was based on his reading of

and interpretation of the CBA.

The arbitrator decided the issue of whether the union

may pursue claims on behalf of former bargaining unit members

regardless of when they ceased employment.  That decision was

reached by the arbitrator's reading of and reliance on the CBA,

and because the arbitrator's resolution of that issue was based

KCEHLOCO

1    on his interpretation of the CBA, the Court's review is narrow.

2            To date, no state or federal court has opined on the

3    union's authority to pursue a grievance on behalf of current

4    and former employees, and with the exception of one case that

5    was cited by the respondents, no state court case brought by

6    employees against respondents addressing related claims has

7    reached a final judgment.  And the union was not a party in any

8    of these cases.

9            There have been issues raised by the proposed

10   intervenors concerning certain state court decisions, but those

11   decisions are not persuasive or binding on this Court because

12   they dealt with a different legal issue and not whether the

13   union has authority to pursue certain claims.  To the extent

14   those decisions reached the merits of arbitrability, they did

15   so improperly because the CBA delegates that authority to the

16   arbitrator.

17           I think I'll stop there.  I'm happy to address the

18   issues related to finality and subject matter jurisdiction and

19   standing, but perhaps it would be better if you would -- if I

20   stopped there.

21           THE COURT:  Great.  Turning to the issues of finality,

22   where in the record is it clear that the parties agreed to

23   submit the additional -- the initial questions of arbitrability

24   and jurisdiction to the arbitrator for a decision at this

25   particular point in the arbitration?

KCEHLOCO

1          MS. BLACKSTONE:  Your Honor, the arbitrator -- at the

2     time the arbitrator gave leave to the parties to submit

3     briefing on those threshold issues, the parties had had

4     numerous discussions during the mediation phase with the

5     arbitrator regarding the importance of submitting these --

6     having a final determination on these issues prior to

7     proceeding on the merits, and so the arbitrator's December 24

8     order which sought briefing was an acknowledgment of the

9     parties' agreement that those issues should be submitted to the

10    arbitrator before a hearing on the merits.

11         THE COURT:  Do I look to anything other, in terms of

12    the record, other than the December 24 order?

13         MS. BLACKSTONE:  Your Honor, I think that's the only

14    thing I can point you to at the moment.  I'd be happy to submit

15    an additional declaration that would provide further support

16    for that if you feel that that is absent, but that is what's --

17         THE COURT:  Well, an additional declaration would be

18    useful briefly.  What I wanted -- and I don't have all of the

19    transcripts of what occurred before the arbitrator, but I think

20    it's useful, for purposes of finality, that -- the

21    understanding that the parties agreed to submit the initial

22    questions of arbitrability and jurisdiction to the arbitrator

23    for a decision.  So, yes, you could submit a brief declaration

24    that explains that to me.  The arbitrator always kept a

25    transcript, didn't he?

KCEHLOCO

1   MS. BLACKSTONE:  There is a transcript of the hearing.

2   There was not a transcript kept of the mediation proceedings,

3   but there is a transcript of the hearing at which those initial

4   issues were argued.

5   THE COURT:  Well, whatever you can provide me in terms

6   of the record that the parties wish to submit those two issues

7   to the arbitrator for a decision going forward would be useful.

8   If I ask for any submissions in the course of today, the

9   parties should submit them to me within one week.  So that

10  would be December 21.  OK?

11  MS. BLACKSTONE:  Understood, your Honor, yes.

12  THE COURT:  On the issue of finality, some of the

13  papers discuss finality in terms of the Federal Arbitration

14  Act, and this is a labor arbitration that was conducted in

15  accordance with the Labor Management Relations Act.  The Second

16  Circuit has made it clear that in a labor arbitration, the FAA

17  doesn't govern.  The FAA can be looked to for guidance, but

18  it's not binding.

19  So my question is many of the cases that are cited,

20  really on both sides, deal with the FAA and not the LMRA.  Is

21  there a rule of finality in an LMRA arbitration that somehow is

22  a bar to a review of a preliminary award by a labor arbitrator?

23  MS. BLACKSTONE:  I am not aware of one, your Honor.

24  THE COURT:  So the whole issue of finality is in this

25  sense not a real issue.  I mean, are there LMRA cases out there

KCEHLOCO

1    that say finality is not a real issue in an LMRA arbitration?

2            MS. BLACKSTONE:  I don't think there are case to that

3    effect either, your Honor.  I do think finality is an issue

4    with respect to review of an arbitration award.  In this case,

5    I don't think --

6            THE COURT:  Even for a labor arbitration?

7            MS. BLACKSTONE:  I don't know the answer to that, your

8    Honor.

9            THE COURT:  There plainly can be a series of very,

10   very important issues in a labor arbitration, including

11   jurisdiction, arbitrability, class action status.  Are there

12   specific cases that give me guidance on how strict or not

13   strict or not at all I should apply a rule of finality?  When I

14   asked this question to the parties, you all gave me as your

15   most persuasive case, I think, *Trade & Transport* in the Second

16   Circuit, but that was decided under the FAA and not under the

17   LMRA.  So after all of this briefing, I have no binding

18   authority on the subject.

19           MS. BLACKSTONE:  I think those cases --

20           THE COURT:  OK.  Go ahead.

21           MS. BLACKSTONE:  No, I think those cases are

22   persuasive.  I hear what you're saying, that we have not

23   pointed you to cases under the LMRA, and I would be happy to

24   come back within a week and provide any of those cases.

25           THE COURT:  If I ask that question, I'm going to get

KCEHLOCO

1   bombarded, as I was when I asked the specific question before.

2   FAA cases are advisory, if you will, on the subject of finality

3   for an LMRA arbitration.  So let's ask on the issue of

4   finality.

5          The various intervenors or objectors say that it's

6   plain that this award was not final, however they define

7   finality, because after the award was issued, the parties

8   agreed to add AccentCare as a respondent; second, the party

9   stipulated to exclude Alvarado from the coverage of the award;

10  and third, at page 18, note 3, the arbitrator said he would

11  reserve what should happen to four employees whom he excluded,

12  what should happen to them at a later date.  And the arbitrator

13  also said he left open the issue of whether there would be an

14  opt-out procedure for purposes of the class.

15         So the question is whether any or all of those items

16  mean that the award items one and two were not final, whatever

17  that means in this context, and your answer is?

18         MS. BLACKSTONE:  They're not -- they don't affect the

19  finality, your Honor.  I'll briefly just go through each of

20  them.

21         The addition of AccentCare, I think that was a

22  clerical issue with -- you know, there are numerous

23  respondents.  The arbitrator's office misspelled many of them,

24  and so that really was not a substantive change to the award.

25         The parties -- with respect to the second issue you

KCEHLOCO

1    raised on stipulating to exclude Alvarado, the arbitrator not

2    because he was bound to but I think in a show of comity and a

3    show of deference to those state court cases where there had

4    been individuals which courts had held could not be compelled

5    under those decisions, he excluded those from the award, and

6    the parties realized after the award was issued that he, in

7    doing so, he had left out one that he clearly would have meant

8    to exclude.  So the parties brought that individual to his

9    attention.  That does not change the final ruling as to the

10   issues over which he has jurisdiction and the arbitrability of

11   the union's claims.  That just confirms that he's acknowledging

12   those handful of people who will not be bound.

13         Similarly on the footnote you mentioned that he

14   reserved decision.  Again, he issued a decision, as you noted,

15   affecting 100,000 employees.  These minor carve-outs of a

16   handful of employees, he's actually not conceding that he has

17   jurisdiction over those 12 or 14 people.  He's just in a show,

18   I think, of deference to those state court decisions excluding

19   them, and it doesn't change his ruling that he has jurisdiction

20   over all of the claims, over all of the employees, and that all

21   of the union's claims are arbitrable.

22         With respect to the opt-out, I mean, I think that what

23   the arbitrator was acknowledging was that there may be -- this

24   is a class-wide arbitration impacting dozens of employers,

25   100,000 employees.  In his review of the merits, there may be

KCEHLOCO

some employees that have slightly different experience in terms
of what they experienced in a particular employer than others.
Again, that doesn't go to the finality of his decision with
respect to his jurisdiction to hear the claims, that the claims
are arbitrable.  That is merely a procedural mechanism down the
line, just as employees down the line, after a decision on the
merits, might have a claim that the union breached its duty of
fair representation.  That's not a claim for now.  That's a
claim down the line.

          Now, there's simply an award which finally determines
two gateway issues which are critical for the parties to be
able to have both the scope of discovery and the hearing on the
merits, and the union is asking that that award be confirmed
before the -- at this juncture.

          THE COURT:  What you've said raises another issue.
When there comes a time -- assuming the arbitration goes
forward, and no one has claimed that it shouldn't go forward,
at least with respect to some people, there may well be a
decision with respect to class action status, including whether
there should be an opt-out class or not and whether the
procedures with respect to the class action are fair or not,
sufficient for due process.  Would that decision be subject to
a motion to confirm or not or vacate?

          MS. BLACKSTONE:  Well, I guess -- your Honor, this is
Laureve Blackstone again.  I think that the procedure that we

KCEHLOCO

1    are familiar with in the context of class actions that are

2    governed by Rule 23, those procedures don't apply here.  This

3    grievance that the union has brought is on behalf of a class.

4    The collective bargaining agreement gives the union the right

5    to bring a grievance on behalf of a class.  So there is a class

6    already certified in a sense, not in the Rule 23 sense.  If the

7    arbitrator rules on the merits of that grievance and he sets

8    forth a process for ways for individuals to not be bound by his

9    decision on the merits, if that decision also comprised his

10   final decision on the merits of the grievance, that award would

11   be subject to confirmation.

12        THE COURT:  I was simply wondering because I think in

13   some other arbitrations the issue of the nature of the class,

14   whether it should be an opt-out class or not, has, in fact,

15   been subject to judicial review at that stage.  And if that's

16   right, it certainly undercuts the argument that the objections

17   to the finality of this particular award are meritorious.  You

18   don't know the answer to that.

19        OK.  What would you like to tell me with respect to

20   the argument that this award should not be confirmed because

21   it's barred by *Rooker-Feldman*?

22        MS. BLACKSTONE:  The union was not a party to any

23   state court action in which -- which raised related claims.

24   This action is not seeking review of any claim that was decided

25   in a state court proceeding, so *Rooker-Feldman* does not apply

KCEHLOCO

because we are not seeking review of a claim that was decided in a state court proceeding.  We are seeking confirmation of an award that was issued pursuant to a collective bargaining agreement.

THE COURT:  The objectors would say that the union is in privity with those employers who lost in some of the state court cases.  Therefore, the union should be considered to be a state court loser.

MS. BLACKSTONE:  Under the doctrine that permits a privy to be bound, that party needs to -- it's a totality of the circumstances test, and among those circumstances are does the party exercise practical control over the action?  The union did not exercise any control over those state court actions.  The union's counsel did not appear in those actions.  There was no relationship.  There was a bargaining relationship, but the union had no relationship to that litigation.  So given that the union was not a party, it's not the driving force behind those cases.  And to the extent it showed up in the cases, the parties, being the union and employer, have diametrically opposite views as to the liability of these claims.  The employers deny liability.  The union is seeking to enforce a collective bargaining agreement which provides for breach of wage and hour statutes.  So it's a little bit difficult to see how privity could be established when the parties have such different positions on the merits of

KCEHLOCO

these claims.

THE COURT:  I would have thought that a more direct
answer was that both the Supreme Court and the Second Circuit
have held that privity does not apply to a *Rooker-Feldman*
analysis and that to apply privity would merge *Rooker-Feldman*
with preclusion rules, but OK.

Let's turn to the merits of the arbitrator's decision.
Your argument, essentially, and correct me if I'm wrong, is
that the issue of whether the arbitrator had jurisdiction to
decide alleged violations of federal law by the respondent with
respect to prior employees is a question of the scope of
arbitration, which is a question of arbitrability, which has
been given to the arbitrator under the AAA rules included in or
incorporated by reference in the 2012 collective bargaining
agreement.

Now -- and, again, correct me if I'm wrong on any of
these steps -- in deciding whether there is a clear and
unmistakable decision to commit a federal statutory claim to a
decision by the arbitrator, you rely on the 2015 memo of
agreement or the 2012 collective bargaining agreement and the
incorporation of the AAA rules or both.  Would the 2015 memo of
agreement incorporating, as it does, the rest of the collective
bargaining agreement, including the incorporation of the AAA
rules, be sufficient as a clear and unmistakable decision to
commit the statutory claim and the scope of the statutory claim

KCEHLOCO

1      to the arbitrator for decision as to the scope of the claim?

2      Does it cover prior employees?

3              Do you follow what I've said?

4              MS. BLACKSTONE:  I think so.  The 2015 MOA is the

5      clear and unmistakable statutory waiver of claims to

6      arbitration.  But in terms of looking at the scope of the

7      application of that, you have to look at the collective

8      bargaining agreement in totality, and that includes the 2012

9      CBA and the 2014.  So there was not -- the union didn't reach

10     agreement specifically on the arbitration of statutory claims

11     until 2015, but when the arbitrator was considering the scope

12     of the union's grievance and what would be encompassed by that

13     grievance, he accurately, I think, looked to the full

14     agreement, which included all three of those documents.  I

15     don't know if that answers what your question was.

16             THE COURT:  No, no, it's getting there.

17             All three of those documents, you're including the AAA

18     rules?

19             MS. BLACKSTONE:  Correct.  The AAA -- the reference to

20     the AAA rules was in the 2012 agreement, and it continued.  It

21     was extended by each of those subsequent agreements.

22             THE COURT:  Does it make any difference, in your view,

23     whether employees were employed by one of the respondents when

24     the 2012 CBA was adopted or when the 2015 MOA was adopted if

25     you take the position that the arbitrator had the right to

1   interpret the agreements as covering prior employees?

2            MS. BLACKSTONE:  That's -- I mean, I think -- I'm not

3   quite sure what you're getting at.  I would say the 2012 was

4   clearly in effect at all times.

5            THE COURT:  OK.

6            MS. BLACKSTONE:  The 2015 -- the arbitrator found that

7   the union could bring claims on behalf of employees under the

8   2015 MOA regardless of whether their employment terminated

9   before or after the adoption of the 2015 MOA.

10           THE COURT:  So it didn't make a difference.  It didn't

11  make a difference whether --

12           MS. BLACKSTONE:  Correct.

13           THE COURT:  -- employees were employed at the time

14  that the MOA was adopted?

15           MS. BLACKSTONE:  Correct.

16           THE COURT:  OK.  Those actually complete my questions.

17  So if there's something that I didn't talk to you about that

18  you want to tell me, I'm happy to listen, or you can also

19  reserve time for after I listen to the interested parties,

20  other interested parties.

21           MS. BLACKSTONE:  I'll reserve my time.  Thank you,

22  your Honor.

23           THE COURT:  OK.  Let me turn -- there are, according

24  to my reading of the papers, three separate groups, if you

25  will, some represented by the same people.  There's Gail Yan

KCEHLOCO

1    who has submitted a lot of papers as an interested party, there

2    are the CPC intervenors, and there are the UJC intervenors.

3    The intervenors seek to intervene and, having intervened, to

4    move to dismiss or stay the arbitration pending decision on

5    state court actions.  So there are two sets of questions for

6    the intervenors.  The first set of questions deals with the

7    procedural posture and the motion to intervene, and the second

8    set of issues which has been raised is the substance of the

9    motions to dismiss or stay.

10           So let me begin with counsel for Ms. Yan.  Is that

11   Ms. Lusher?

12           MS. LUSHER:  Yes, your Honor, I'm here.

13           THE COURT:  Hi.  I have an initial question, which is

14   why should I listen to Ms. Yan?  Ms. Yan hasn't made a formal

15   motion to intervene.  She's not a party.  She's listed on the

16   docket sheet as an interested party, but she's been submitting

17   lots of paper.  It's not clear to me what her right to

18   participate, other than an amicus, is, and she never even

19   sought leave to participate as an amicus.  She's simply been

20   filing papers.  If I denied any of her applications, she would

21   have no right to appeal because she's not a party.  So why

22   should I consider the arguments that she's even making?  I

23   realize the other intervenors have said:  Oh, yeah, we adopt

24   the arguments of Ms. Yan.  That's my first procedural question.

25           My other related questions are, as I understand it,

KCEHLOCO

Ms. Yan was a union member at some point in 2014.  She's a
union member today.  She's represented today by the union.  To
the extent that she's unhappy with their representation of her,
she would have a claim against the union for denial of the
right to fair representation.  What is her interest here?

Finally, she's not a party to the arbitration.  The
arbitration consists of the union and a group of respondents,
not Ms. Yan.  Those are my questions, initial questions, to
Ms. Yan.

MS. LUSHER:  Yes, your Honor.  I have a couple of
responses to that.  One, just to be clear, Ms. Yan is not a
member of the union.  She is not working for any of the
respondents today.  Her employment with First Chinese
Presbyterian stopped in 2014, and she has not gone on to work
for any other 1199 agency as we've been made aware.

THE COURT:  OK.

MS. LUSHER:  So, secondly, Ms. Yan is an interested
party because she's being forced to arbitrate claims from when
she did work for First Chinese Presbyterian when courts,
multiple courts, including the court that -- where the
litigation was brought against First Chinese Presbyterian for
unpaid wage claims.  Outside of the CBA, statutory claims were
brought pursuant to New York law.  That court has already
decided that former employees are not bound to arbitrate their
claims and that the court had the authority to decide

KCEHLOCO

1    arbitrability and even issued an injunction against the

2    arbitration of former employees' claims.  That's just one of

3    the multiple --

4              THE COURT:  I'm sorry.  She was -- I'm sorry.  She was

5    not a named party in that litigation, was she?

6              MS. LUSHER:  No, she was not.  She was a putative

7    class member.

8              THE COURT:  Putative class member.  And the class has

9    never been determined in that other action, has it?

10             MS. LUSHER:  A class has not been certified, but

11   Ms. Yan's rights were protected by the filing of this class

12   action complaint which tolled the statute of limitations for

13   her claims along with the others, and also under Article 9

14   where the action was brought in New York state court, pursuant

15   to Article 9 of the Civil Practice Law and Rules of New York

16   state courts, Article 9 gives the court broad authority to

17   protect and issue orders relating to the putative class.  And

18   while there has not been a motion determining whether or not

19   the action can be certified as a class action, that is mostly

20   because this litigation has been -- we haven't gotten to that

21   phase in this litigation because there has been so much

22   fighting about the arbitration issue, but it's been fully

23   briefed and argued.

24             THE COURT:  You still haven't answered my question.

25             MS. LUSHER:  I would like to.

KCEHLOCO

1          THE COURT:  Good.  OK.

2          MS. LUSHER:  Ms. Yan is also an interested party.

3   Because of those reasons, Ms. Yan is an interested party, and

4   there are cases that we cited in our brief for the proposition

5   that a nonparty can raise issues of lack of subject matter

6   jurisdiction without being a party; that nonparties are allowed

7   to raise those issues to the court because the court,

8   respectfully, is supposed to decide whether it has jurisdiction

9   over these matters.  So she is appearing as an interested party

10  but a nonparty that is raising these issues that the case law

11  supports that she's allowed to.

12         I will also just note that in one of our submissions,

13  Ms. Yan's submissions, there was a footnote that if your Honor

14  decided that intervenor status was necessary, that Ms. Yan

15  would join in the intervenor application with the other

16  intervenors, but she never formally did that, it's true.  She's

17  just always been a nonparty.

18         THE COURT:  So if I denied any relief that she was

19  seeking, there would be no recourse for Ms. Yan because she is

20  not a party, with no right to appeal.  She would end up being

21  in the same status in the Court of Appeals:  Filing a brief,

22  advising the court that, in her view, there was no jurisdiction

23  in the district court, and the Court of Appeals should sua

24  sponte find that there was no jurisdiction, is that right?

25         MS. LUSHER:  Yes, except for I think that Ms. Yan

KCEHLOCO

1  would hope that she could make an application to join in the

2  intervenor's motions as she noted in her original papers.

3  THE COURT:  But there's lots of law out there that you

4  don't make motions in a footnote.  So the extent of her motion

5  to intervene is a footnote?

6  MS. LUSHER:  She was relying on the case law that says

7  that she could raise it as a nonparty, but yes.

8  THE COURT:  OK.  One of the arguments that the union

9  makes is that a union has the ability in an arbitration to

10  argue for the right not only of employees but of former

11  employees.  And in your responsive papers to me in which I

12  asked for the three leading cases on which you rely for the

13  proposition that a union has no right to represent in an

14  arbitration the rights of former employees, you cite one

15  district court case and two trial court cases from the New York

16  state courts.  Those you list as the most persuasive

17  authorities for your proposition that a union has no right in

18  an arbitration to represent the rights of former employees.

19  That's surely not binding authority and questionable how

20  persuasive.

21  That's the most persuasive authority that the union

22  cannot, in the course of an arbitration, represent the rights

23  and grievances of former employees?

24  MS. LUSHER:  Yes, your Honor, for a situation that is

25  directly on point with the current situation, yes, in the

KCEHLOCO

*Konstantynovska* decision that we cited, it was also cited in

*Agarunova v. Stella Orton Home Care Agency*.

THE COURT:  Go ahead.

MS. LUSHER:  So in the *Konstantynovska* decision, while

I agree it's a trial court decision from a New York state court

and it's not binding, but the Second Circuit cited to it in its

*Agarunova* decision.  So that's one of the reasons that we cited

to it in our papers.

THE COURT:  But in none of those -- go ahead.

MS. LUSHER:  I'm sorry.  No, you go ahead, please.

THE COURT:  No, no, I didn't mean to interrupt you.

Go ahead.

MS. LUSHER:  Well, I think that the *Orlando v. Liberty

Ashes* decision is also on point and very persuasive to the

current situation.  And we noted also the trial court's

decision in the *Stella Orton* case as well, and Stella Orton

happens to be a respondent in these proceedings.  Also, the

*Konstantynovska* decision happens to be cited repeatedly

throughout all of the cases, the state court cases and, as I

mentioned, the Second Circuit case, as a citation for authority

for this proposition that former employees cannot be bound in

this situation.

THE COURT:  OK.  Let me just --

MS. LUSHER:  I'm sorry.  Go ahead.

THE COURT:  Let me just stop you.  Isn't the fair

KCEHLOCO

1    distinction in all of those cases that the union was not a

2    party in those cases?  The issue was, as between the employee

3    and the employer, if the employee didn't, wasn't -- if the

4    employee, in fact, was not an employee at the time that the

5    alleged contract was signed, the employee is not bound by the

6    contract.  But the cases didn't consider, first, what is the

7    situation with a union representing present and past employees?

8    And in that context, the union plainly is a party to the

9    agreement with the employer.  The issue, then, is what is the

10   scope of the arbitration agreement and did the parties assign

11   to the arbitrator the decision as to what the scope of the

12   arbitration agreement was, including whether it would include

13   prior employees?  That question was specifically not raised in

14   the Second Circuit decision, and it's not raised in any of the

15   state court decisions because they were not decisions involving

16   the union.  So isn't that right?

17            MS. LUSHER:  The decision was not decided upon

18   directly in the Second Circuit, that is true, because they said

19   that the respondents had not briefed it in their original

20   papers, in their initial papers.

21            THE COURT:  Right.

22            MS. LUSHER:  And the Second Circuit declined to rule

23   on that.  However, it was raised in some of the trial courts,

24   in some of the state court decisions below.  The respondents

25   argued that they were union members.  While those opinions that

KCEHLOCO

the state courts issued didn't necessarily get into a large

discussion about that, the overall findings were that the union

was not authorized to represent these individuals because the

underlying agreements did not give them that authority.

I think this goes to another one of your Honor's

questions.  I mean, specifically, for example, in the *Hichez*

decision that was decided by the First Department, it was the

third decision decided by the First Department where they found

the same way and the same unanimous holding that the 2012

collective bargaining agreement did not call for the

arbitration of statutory wage claims and that the 2014

agreement was only an agreement to later on decide to enter

into another agreement.

Then the 2015 agreement was finally an arbitration --

an agreement where the parties, the union and the respondent,

agreed to arbitrate statutory wage claims, but the language of

that agreement is that the arbitration procedures would be

subject exclusively to the procedures laid out in that article,

and that's the agreement that these parties followed when they

engaged in the arbitration, as found by Judge Lebovits in the

*Troshin* decision.  That they followed those procedures

exclusively, and that it was an exclusive -- the procedures

were laid out in that agreement, and that these individuals who

had left their employment prior to that agreement being

executed were not bound to arbitrate their claims underneath

KCEHLOCO

1    it.

2          THE COURT:  Could I just stop you for a second.

3          MS. LUSHER:  Yes.

4          THE COURT:  In each of those cases, the state courts

5    decided that the scope of the arbitration was to be decided by

6    the court and not by the arbitrators.  Fair?

7          MS. LUSHER:  Yes.  And also in Judge Sullivan's

8    decision in *Orlando v. Liberty Ashes*.

9          THE COURT:  Isn't that plainly wrong under federal law

10   when the parties incorporate the rules of the AAA and

11   specifically allow the scope of the arbitration to be decided

12   by the arbitrator?  Isn't that under Second Circuit law a clear

13   and unmistakable delegation of arbitrability to the arbitrator?

14         MS. LUSHER:  But that's what was set forth in the --

15   yes, but that's what was set forth in the 2012 CBA which did

16   not call for the arbitration of statutory wage claims.  And the

17   court found --

18         THE COURT:  Hold on.  Hold on.  But the 2015 MOA was

19   an addendum, an amendment to, an addition to the 2012 CBA,

20   wasn't it?

21         MS. LUSHER:  The 2015 MOA says that the article, the

22   arbitration article, is a new article that is hereby created in

23   that agreement, and that the arbitration provisions contained

24   in there are to be followed exclusively as to that article.  It

25   does not incorporate the 2012 provision under the CBA.  It does

KCEHLOCO

1    not incorporate it.  In fact, it doesn't mention the AAA rules.

2    It mentions going to --

3              THE COURT:  Hold on.  Hold on.  Hold on.

4              The arbitrator found that the MOA was, in fact, part

5    of the 2012 CBA and brought forward the incorporation of the

6    AAA rules, didn't he?

7              MS. LUSHER:  He did, but --

8              THE COURT:  So you would require that I find that the

9    arbitrator was simply wrong in his interpretation of the 2012

10   collective bargaining agreement and the 2015 MOA?

11             MS. LUSHER:  Correct.  Again, the AAA rules are --

12             THE COURT:  Whoa, whoa, whoa, whoa.

13             MS. LUSHER:  Sorry.  I apologize.

14             THE COURT:  Whoa, whoa.  What's the standard that I

15   should apply in making a determination of whether the

16   arbitrator was wrong?

17             MS. LUSHER:  Well, I don't think that your Honor, from

18   our position, your Honor has to make that determination.  It's

19   that it was already decided by multiple courts that former

20   employees were not bound, including the Second Circuit.

21             THE COURT:  Hold on.  Hold on.  We've already said

22   that the Second Circuit didn't decide the issue of

23   arbitrability.  The Second Circuit was not faced with any

24   issues of what deference it owed to a decision by the

25   arbitrator.  It was not ruling on a case where the union was a

KCEHLOCO

party, but let me move on.  I'll come back to you, but I do
want to talk to the other intervenors who have actually filed
motions to intervene before I get to the specific objections
that have been raised and the merits that we've been talking
about.

So let me turn to the CPC and the UJC intervenors.  My
initial question, which is the procedural question, is what
interest do the intervenors have that gives them a sufficient
interest to intervene?  More precisely, as I understand it, and
you can correct me if I'm wrong, with respect to Hichez,
Carrasco, and Acosta, they've been carved out of the
preliminary award, so they're not harmed in any way by the
preliminary award.  They're carved out.  With respect to the
CPC intervenors, Chu, Chung, and Ling, at the moment in the
state court, as I read the papers, they've been ordered to
arbitrate.

So the initial question is what is the interest that
these intervenors have?

The second question I have is for all of these
intervenors.  Weren't they required to pursue the union
grievance procedure for their claims that they were not being
compensated as required by their employers?

And my third question is don't all of these
intervenors lack standing to object to the petition to confirm
the arbitration award because the parties to the arbitration

KCEHLOCO

1    are the union and the respondents?  To the extent that any of

2    the intervenors have an objection, the way in which an

3    objection is raised is they have a complaint against the union

4    for a lack of fair representation.

5          So three questions for the intervenors:  What's their

6    interest?  Weren't they required to pursue a grievance

7    proceeding?  And don't they lack standing?

8          MR. TAUBENFELD:  Thank you, your Honor.  Michael

9    Taubenfeld for the CPC and CJC intervenors.

10         Starting with the first question, I think it's

11   important to point out for the two intervenors, they've

12   actually not been ordered to arbitrate.  There was never a

13   motion made for them to arbitrate.  In fact, when the case was

14   remanded back to state court, then Judge Forrest determined

15   that they did not have to arbitrate because the MOA did not

16   apply to them since they all stopped working for CPC before the

17   MOA was entered into.  So they clearly have an interest in the

18   sense that they've not been ordered to arbitrate, and the union

19   is purporting to represent them in this arbitration.

20         With regards to the Hichez intervenors, we essentially

21   agree with Ms. Lusher, Ms. Yan's counsel, that Article 9 of the

22   CPLR gives them, as purported class representatives, the right

23   to protect the interests of the class members of the purported

24   class.  So, essentially, that would be their interest as well.

25         We also indicated we were recently contacted by Maria

KCEHLOCO

Diaz who we advised the Court about last Monday.  She did not

work for UJC after the MOA came into effect, and she would also

be interested in intervening, if it's necessary, in order to

protect her rights and to potentially protect the rights of

other purported class members.  So that's the answer to the

first question.

In terms of the grievance procedures, none of these

individuals, the two or the UJC -- UJC intervenors, the

original six who have cases below, were employees of UJC or CPC

at the time that the MOA came into effect.  They had no

obligation to ever proceed with the grievance procedure one

that was in place under the 2012 CBA which really addressed

issues under the CBA itself.  It did not address statutory

claims independent of the CBA.  So if they had claims under the

New York labor law, they certainly had no obligation to grieve

those claims, which is why in *Hichez* the state court held that

they didn't -- essentially why they didn't have to arbitrate in

the first place, and same reason why Judge Forrest essentially

held that they didn't have to arbitrate when she remanded the

case back to state court.

In terms of the third question, we understand and

acknowledge that nonparties are usually not entitled to

intervene and to challenge arbitration awards, and in the

context of labor arbitrations, usually if the union brings a

grievance on behalf of an employee for a claim under a CBA, so

KCEHLOCO

1    if an employee is claiming that he or she was terminated

2    improperly under the CBA, the union has a right to grieve that.

3    And certainly once an arbitrator reaches a decision, the

4    employee typically doesn't have the right to challenge that

5    decision.  But where the employee has a substantial interest in

6    the arbitration because their claims arise independent of the

7    CBA, as is the case here, we would argue that they certainly

8    have that standing to challenge a determination by an

9    arbitrator, which is essentially designed to at least attempt

10   to impair their rights.

11           It's important to point out what essentially has

12   happened is --

13           THE COURT:  I'm sorry.  What cases do you rely on for

14   that proposition?

15           MR. TAUBENFELD:  We cited in our brief the *Association*

16   *of Contracting Plumbers of the City of New York v. Local Union*

17   *No. 2* for the principle that if a party -- if a nonparty to a

18   confirmation proceeding has substantial interest in the

19   arbitration, that they have a right, I would say, of standing

20   to challenge, as well as *Holborn Oil Trading v. Interpetrol*

21   *Bermuda Ltd.*  Now, we acknowledged that those cases are not

22   directly on point, but we believe they stand for a general

23   principle where someone has a substantial interest in the

24   arbitration in the sense that their rights are going to be --

25   someone is attempting to impair their rights, that they have a

KCEHLOCO

1  right to intervene in order to challenge those confirmation

2  proceedings.

3          It's important to recognize what essentially is

4  happening here is we have numerous plaintiffs working for

5  numerous agencies who have brought claims in court and have won

6  case after case after case, and now we have, years later, the

7  union essentially changing its mind and decides:  OK.  Now

8  we're going to intervene because we essentially want to prevent

9  these cases from going forward.  They work in lockstep with

10  these agencies.

11          THE COURT:  Whoa, whoa, whoa.  In fairness, the total

12  number of people who have appeared in this action to complain

13  about what the union has done is about 14.  The union seeks to

14  represent over 100,000 present and former employees.  In the

15  state court litigations, no action has ever been certified as a

16  class, I think.  You can correct me if I'm wrong on that.

17  While the union arbitration is proceeding towards the merits

18  early next year, that doesn't seem as though it would be

19  deleterious to the 100,000 employees who are being represented

20  by the union.

21          MR. TAUBENFELD:  Your Honor, we have no issue with the

22  vast majority –– we don't know the numbers.  The union has not

23  indicated how many of the hundred thousand people are

24  individuals who stopped working before the MOAs came into

25  effect.  It may be a small number; it may be a large number.

KCEHLOCO

We don't know.  But we certainly have no issue with the
arbitration proceeding as to the people who worked after the
MOAs came into effect.  There is a number of people who worked
before, and there are a number of cases that have been pending
for years in order to protect those rights of those individuals
and to allow those claims to proceed in court.

     THE COURT:  Have any of them ever proceeded to an
award to the employees?

     MR. TAUBENFELD:  I'm not aware of any that have.  I
know that we've seen cases that --

     THE COURT:  Yes.  So what's the history?  For years on
behalf of these employees, the litigations have been chugging
along with no discernible benefit to those who are being
represented, and those who have been representing those people
to no discernible benefit now seek to stay or dismiss the union
arbitration on behalf of those employees and others, other than
the ones who have been specifically carved out and who have
received orders from the state court, fair?

     MR. TAUBENFELD:  We acknowledge that the cases have
not moved.  Those are largely for procedural reasons that have
prevented us from proceeding to a point where we can make a
motion for class certification.  We do acknowledge that the
cases haven't, unfortunately, been able to move, largely
because of this -- not this specific confirmation proceeding or
this specific arbitration, but because of all the underlying

KCEHLOCO

1    arbitration issues.  That has been what has prevented the cases

2    from moving forward.

3            THE COURT:  OK.  Those were my initial questions with

4    respect to the issues of procedural issues, as I've described

5    them.  So now I would be certainly prepared to talk to the

6    intervenors or interested party with respect to the specific

7    issues that I had raised with the union also.

8            So, first, with respect to the issue of finality, it's

9    not clear to me why the issue of finality under the FAA is

10   dispositive as to whether I should be able to hear the petition

11   to confirm the arbitration award at this point.  The FAA by its

12   terms doesn't -- or according to the Second Circuit, doesn't

13   apply in a labor arbitration.  It can be looked at for

14   guidance, but it's not determinative.  So why is this award,

15   which decides two major issues, not sufficiently final for

16   purposes of a labor arbitration to be reviewed at this point?

17   And what's the standard I should apply to determine, for

18   purposes of a labor arbitration, whether this is sufficiently

19   final for me to review?

20           Ms. Lusher or Mr. Taubenfeld.

21           MS. LUSHER:  Hi, your Honor.  This is Ms. Lusher.

22           Well, I would like to first point out that it's

23   definitely -- it's our position that it's not a final award for

24   many of the reasons that you had raised with the union earlier,

25   in that it's still open to revision, one in particular, and I

KCEHLOCO

think it's even more apparent that it's open, subject to
revision, given that the union is not seeking to confirm
anything except for items one and two of the award, and the
item that is with respect to the carve-out of the named
plaintiff, they are not seeking confirmation of.  And those
named plaintiffs in these proceedings are former employees --

THE COURT:  Hold on.  Hold on.  You've jumped over my
question.

My question is what's the standard that I ought to be
applying under the LMRA?  Is there a finality standard and what
is it?  And why under that standard isn't this a sufficiently
discrete issue of arbitrability and jurisdiction, which is an
important issue that was teed up for the arbitrator and decided
by the arbitrator?  What's the restriction in the LMRA that
prevents me from deciding it?  All of you have argued this
issue out at great length.  It's plainly an important issue.
It was teed up for the arbitrator.  The arbitrator decided that
the scope of his authority included deciding the issue with
respect to former employees and that he had the right to decide
that, and he did.  The parties essentially look to the text of
the FAA in confirming a final award, but the text of the FAA is
not what governs here.

MS. LUSHER:  Yes.  In our brief we cited to the *Mason
Tenders* decision that I believe sets forth the review.  I
believe that that case was governed by the LMRA, and it

KCEHLOCO

1   discusses the finality of an award and whether or not it's ripe

2   for judicial review and that the arbitrator needs to decide

3   finally all of the issues in the arbitration.  Our position

4   is --

5            THE COURT:  According to the collective bargaining

6   agreement.  It's a question of what does the collective

7   bargaining agreement -- what's the intent, if you will, of the

8   collective bargaining agreement, isn't it?

9            OK.  All right.  Anything you wanted to add,

10  Mr. Taubenfeld?

11           MR. TAUBENFELD:  One thing I guess we -- the only

12  point we'd make, it seems like all the parties have adopted the

13  FAA's definition, so we feel that that's probably the

14  definition.  To the extent the Court is going to ask for

15  additional briefing on that, we would ask to be permitted to do

16  that as well.

17           THE COURT:  OK.  But, look, I asked for cases last

18  time, and I got a 30-page brief.  You can give me cases.  I

19  don't need a long explanation of the cases.  You can just give

20  me the list of the cases, same time limit, next week, and I'm

21  happy to read the cases.  No letter should be longer than two

22  pages.

23           Let's turn to *Rooker-Feldman*.  There's been a lot of

24  briefing over *Rooker-Feldman*, and I don't understand the

25  briefing on *Rooker-Feldman* because both the Supreme Court and

KCEHLOCO

the Second Circuit have said that privity doesn't apply in the

context of *Rooker-Feldman*, most recently the Second Circuit in

*Kosachuk against Selective Advisors*, following the Supreme

Court's decision in *Lance*, and so I don't understand how a

*Rooker-Feldman* argument can survive.  The *Rooker-Feldman*

argument depends on the argument that the union is in privity

with the losing party employers in the state court litigation.

Once the Supreme Court and the Second Circuit tell us that

privity doesn't apply in the context of *Rooker-Feldma*n, I don't

understand how there can be any longer a *Rooker-Feldman*

argument.

           Ms. Lusher.  Mr. Taubenfeld.

           MS. LUSHER:  Your Honor, I am not familiar with that

decision, and we apologize if we made an argument that seems to

have been a waste of the Court's time.  But the only thing I'll

add is just in some of these cases, not all but some of these

cases, the union did submit papers.  They were not a party,

it's true, but they did submit briefs or letters to the court.

So that was one of our strong points for arguing that they were

in privity with the respondents and that their interests were

aligned, but perhaps the arguments for collateral estoppel or

*res judicata* are stronger for our position.

           THE COURT:  All right.  With respect to collateral

estoppel or *res judicata*, there has been no final decision, has

there been, in the various state court actions?  They're still

KCEHLOCO

1    ongoing?

2              MS. LUSHER:  There's been no final determination on

3    the merits, but our argument is that that is not necessary for

4    collateral estoppel or for *res judicata*.  And we cite to cases

5    in our brief saying that as long as the issue that is -- the

6    parties are attempting to re-litigate, as long as that had

7    reached a final determination, that you can find collateral

8    estoppel bars re-litigation of that and/or *res judicata*.  And

9    that's our position, that the arbitration issue will not be

10   revisited in the state court proceedings.  It's been finally

11   determined on that issue, and it should be barred from being

12   re-litigated here.

13             THE COURT:  That, of course, would also depend on an

14   argument of privity, because the union was not a party in any

15   of the state court actions, right?

16             MS. LUSHER:  That's correct, and -- but we cited case

17   law that privity can be found with respect to those two

18   doctrines.

19             THE COURT:  OK.  Let's turn to the merits for a few

20   moments.  Many of the state court decisions have said that the

21   issue of whether the prior employees are -- whether the scope

22   of the arbitration -- the scope of the arbitration agreement is

23   a matter for the Court and not for the arbitrator.  And I

24   raised this with you before, but isn't that plainly wrong under

25   the AAA rules and the 2012 collective bargaining agreement?

KCEHLOCO

1          MS. LUSHER:  Well, as I was explaining before, the

2    2012 collective bargaining agreement doesn't require the

3    arbitration of statutory wage claims.  It's simply a grievance

4    procedure.  Then when the parties drafted and negotiated the

5    memorandum of agreement, the 2015 MOA, they included statutory

6    wage claims at that time but said that they were governed

7    exclusively by that new article that was then created, and that

8    the procedures with respect to arbitrating statutory wage

9    claims was to be followed exclusively pursuant to that article.

10   That article does not refer to the AAA rules, and in fact,

11   it --

12         THE COURT:  OK.  All right.  Go ahead.

13         MS. LUSHER:  I was just going to say --

14         THE COURT:  Finish your thought.

15         MS. LUSHER:  It names Mr. Scheinman specifically as

16   the arbitrator, and several courts have found that that's the

17   procedure that the parties pursued with specifically to that

18   agreement, the 2015 MOA.

19         THE COURT:  But then we are down to where we were

20   before in the discussion.  The arbitrator found to the

21   contrary, and you simply want me to find that the arbitrator

22   was wrong.  And I asked you before what's the standard that I

23   apply to determine the question of whether the arbitrator was

24   wrong?  I had thought that the standard that I have to apply is

25   deference to the arbitrator.  Arbitrator's decision must be

KCEHLOCO

1    confirmed if it has a barely colorable basis in the collective

2    bargaining agreement, if the arbitrator was applying the

3    collective bargaining agreement and not simply the arbitrator's

4    own band of industrial justice, if there's a colorable basis

5    for approving it.  It's not for the Court to determine whether

6    it's right or wrong.  All of those standards have to be

7    applied, right?

8            MS. LUSHER:  Yes, I believe that's correct, if this

9    was a normal confirmation of an arbitrator's award.  My -- I'm

10   not trying to avoid your Honor's question.  I agree with that

11   standard.

12           What we're saying is that the Court should not get to

13   evaluating it on -- under that standard because, first, we're

14   arguing that it is not a final determination, and secondly,

15   that due to these state court orders and also orders from some

16   of the federal courts that the court, under collateral estoppel

17   or *res judicata*, is precluded from reviewing the arbitrator's

18   award because it would essentially overturn those state court

19   orders that have found the exact opposite.

20           THE COURT:  OK.  Anything you want to add,

21   Mr. Taubenfeld?

22           MR. TAUBENFELD:  Nothing for us, your Honor.

23           THE COURT:  Before I turn to the motion to remand, I

24   should listen to the union for anything that the union would

25   like to tell me in reply.

KCEHLOCO

1      MS. BLACKSTONE:  Hello, your Honor.  This is Laureve

2  Blackstone.  We have nothing further.  Thank you.

3      THE COURT:  So let me turn -- well, the intervenors

4  specifically raised the question of collateral estoppel and *res*

5  *judicata* independent of their argument of *Rooker-Feldman*.

6  What's the union's response?

7      MS. BLACKSTONE:  Again, your Honor, the union was not

8  a party.  The issues before the state court were not the issues

9  before the arbitrator, and so neither of those doctrines would

10  apply.

11      THE COURT:  What about the argument of privity for

12  purposes of collateral estoppel and *res judicata*?

13      MS. BLACKSTONE:  The principles of privity under

14  New York law, I think, would be the same.  They're certainly

15  that the union was not exercising practical control.  It was

16  not represented by any of the parties.  It takes a different

17  position from the respondents, the employers in those cases,

18  and there's no -- again, no overlapping claims.  So there can't

19  be privity.

20      THE COURT:  OK.  Before I turn to the issues of -- to

21  the motions to remand, there are a lot of respondents in the

22  case who have been quiet, and if any of the respondents wanted

23  to add anything, I would certainly listen to them.  They're,

24  plainly, parties.  I'm not saying that you have to say

25  anything.  I'm just giving you the opportunity.

KCEHLOCO

1          No.  OK.  Great.

2          So now I have the motions to remand.  I'm prepared to

3     listen to arguments on the motion to remand in both cases.  Is

4     it Ms. Lusher or Mr. Taubenfeld or both?

5          MS. LUSHER:  It's Ms. Lusher, your Honor.  I'll be

6     handling that.

7          THE COURT:  Here's my question:  I really don't

8     understand why there's not federal jurisdiction based on the

9     fact that your client moved to stay or dismiss the arbitration,

10    which is a labor arbitration under Section 301 of the LMRA.

11    The defendant did not move to -- did not remove until the order

12    to show cause was filed.  The case was proceeding in state

13    court for some time, but when the arbitration, which is under

14    federal law, sought to be interfered with in the state court

15    proceeding, there was then the motion to remand -- I'm sorry,

16    there was then the removal.  My question is why wasn't that

17    sufficient for federal jurisdiction?

18         MS. LUSHER:  Well, your Honor, we were not trying --

19    the individuals were not trying to stay the arbitration.  They

20    were simply trying to carve out or get a modification of the

21    arbitrator's award that it did not apply to former employees,

22    since in both cases the state courts had already ruled that

23    former employees were not subject to arbitrate their claims.

24    There were at least two orders issued in both the *Guzman* action

25    and also in the *Alvarado* action to that effect.

KCEHLOCO

1          So the order to show cause, very similarly to the case

2     we cited, the *Contemporary Electric* matter that we cited, there

3     was no valid agreement to arbitrate to begin with, and the

4     courts had found this.  So the order to show cause was based on

5     those court orders, not on any labor agreement, and no labor

6     agreement was attached to any of the order to show causes.  And

7     the relief that was sought was under New York state statutes,

8     not under federal law.

9          So similarly to the cases that we cited in our briefs

10    and in our supplemental submission to your Honor, where there's

11    found that there is no valid agreement to arbitrate, there is

12    no federal jurisdiction under the LMRA.  It's almost directly

13    on point with the *Contemporary Electric* case where, in that

14    case, a party that was arguing that it was not subject to an

15    agreement to arbitrate had also brought an order to show cause

16    based under state statute, and the court found that there was

17    no jurisdiction; that it was all resolved under state law.

18         THE COURT:  There plainly was a valid agreement to

19    arbitrate.  There was a collective bargaining agreement which

20    included an arbitration clause.  There was a subsequent 2015

21    memo agreement which carried forward arbitration.  There were

22    parties to the arbitration agreement, namely, the union on the

23    one hand and the employer on the other hand.  There was an

24    arbitrator appointed, and there was an ongoing arbitration

25    that -- go ahead.

KCEHLOCO

1       MS. LUSHER:  Your Honor, respectfully, every court

2   that has considered this issue has found that the 2015

3   agreement was not a valid agreement to arbitrate for former

4   employees, including the *Agarunova* decision.  While I agree

5   and -- admit and agree that, your Honor, they did not decide

6   the question of the arbitrator's jurisdiction, they did decide

7   that former employees were not bound to arbitrate under the

8   2015 MOA and that the 2012 -- the provisions in the 2012 CBA

9   did not carry over to the 2015 MOA.  That they saw them as

10  separate and distinct agreements.  That is what the motions to

11  remand and also the motion to dismiss the underlying principle

12  of all of these court orders is that there is no valid

13  agreement to arbitrate for former employees who left their

14  employment before that was --

15      THE COURT:  I understand the argument.  *Agarunova* was

16  not faced with the decision of arbitrator, nor with the

17  argument of arbitrability.  I'm right, am I not?

18      MS. LUSHER:  That is true.  Yes, you are right about

19  that.

20      THE COURT:  OK.  All right.

21      MS. LUSHER:  But the arbitrator -- I'm sorry.

22      THE COURT:  I didn't mean to cut you off.  Go ahead.

23      MS. LUSHER:  The arbitrator made that decision and

24  disregarded the court decisions that had already found that.

25  Yet he carved out the named plaintiffs.  So the arbitrator's

KCEHLOCO

1    award itself is contradictory.  While he says that he has

2    jurisdiction to decide the claims of former employees and that

3    they are arbitrable, because of the court orders, he carves out

4    the named plaintiffs.  So he's contradicting his own finding

5    but recognizing that courts have found, at least that named

6    plaintiffs who were former employees, were not bound to

7    arbitrate their claims, which is another --

8         THE COURT:  Well, he didn't quite say that.  He said

9    that the employers would be placed in a difficult position

10   because they were under an order from the state court, and that

11   was the reason that he was carving out the eight people that he

12   carved out.  Fair?  He didn't say that he would not have had

13   jurisdiction over them.  He said that because there were

14   outstanding orders, his order would not apply to them, because

15   otherwise the employers would be under conflicting orders.  Is

16   that fair, yes?

17        MS. LUSHER:  I mean, I guess that you could read it

18   that way.  I perhaps maybe am too close to the issue, but it's

19   our position that it is contradictory.  If that's his reason,

20   because he thought that it would be unfair to the respondent,

21   if he really thought he had jurisdiction, he could have just

22   assumed jurisdiction over everyone if he really was going to

23   disregard multiple orders from multiple courts.  And he was

24   even given the *Agarunova* decision.

25        THE COURT:  All right.  Does anyone want to respond on

KCEHLOCO

the motions to remand?  No.

MR. KLEIN:  Your Honor, Douglas Klein from Jackson
Lewis.

Just very briefly, one issue that was briefed and most
recently stated in Ms. Lusher's submission was this issue,
particularly in the First Chinese case, of the injunction
issued by the state court back in January of 2020.  That
injunction order plainly was limited to the three named
plaintiffs as evidenced, frankly, by the fact that plaintiffs
then went back to court in May, which was the basis for removal
here, to expand the scope when the court had made clear in a
May 15 telephone conference with the parties that, yes, in
fact, that order was limited to the three named plaintiffs.  So
if plaintiffs were seeking to expand that relief, they should
do so, which plaintiffs did.

So perhaps a minor point, but it does confirm the fact
that the court's orders were limited to the named plaintiffs
despite how plaintiffs may have defined that term in a brief,
for example.  So I did just want to make that point, and I can
provide some record cites for the documents if it's helpful.

THE COURT:  Go ahead.

MR. KLEIN:  The initial state court decision on the
motion to compel arbitration was March 29, 2019.  This is all
in First Chinese, and that's at 15-3.  The preliminary
injunction of January 13, 2020, is on your Honor's docket at

KCEHLOCO

1    15-4.  And then the relief, again, which was the basis for the

2    removal in May is at 15-6.  And specifically, plaintiffs in

3    that relief application were seeking to modify the Court's

4    January order to show cause; meaning they acknowledge that the

5    January order didn't go beyond the named plaintiffs.

6            Thank you, your Honor.

7            THE COURT:  OK.  Thank you.

8            All right.  Well, I will take all of the matters under

9    advisement.  I've given an opportunity for the submission of

10   any additional cases in submissions of no more than two pages

11   by next Monday, I believe, December 21.

12           OK.  Thank you all.  I appreciated the papers.  I

13   appreciated the argument.  Great.  Bye now.

14           (Adjourned)

15

16

17

18

19

20

21

22

23

24

25