# Exhibit A

```
----------------------------------- X
In the Matter of the Arbitration
                                    X
            between
                                    X
HOME HEALTH CARE AGENCIES,                  Re: Class Action
                                    X           Grievance
                "Employers"                     (Modified Award)
                                    X
            - and -
                                    X

1199SEIU UNITED HEALTHCARE          X
WORKERS EAST
                                    X
                "Union"
----------------------------------- X
```

**APPEARANCES**

> **For the Employers**
> BOND SCHOENECK & KING, P.L.L.C.
>   Michael P. Collins, Esq., Of Counsel
>   James E. McGrath, III, Esq., Of Counsel
>   Rebecca K. Kimura, Esq., Of Counsel
>   (for PSC Community Services, Inc., limited
>   appearance for Premier Home Health Care, Priority
>   Home Care, Inc.,)
>
> EPSTEIN BECKER & GREEN, P.C.
>   Patrick G. Brady, Esq., Of Counsel
>   (for New Partners, Inc. d/b/a Partners in Care)
>
> FORD HARRISON L.L.P.
>   Philip K. Davidoff, Esq., Of Counsel
>   (for Stella Orton Home Care Agency, Richmond Home
>   Needs, Sunnyside Citywide Home Care, Sunnyside Home
>   Care Project, and Care at Home)
>
> HOGAN LOVELLS U.S., L.L.P.
>   Kenneth Kirschner, Esq., Of Counsel
>   David Baron, Esq., Of Counsel
>   (for Chinese-American Planning Council
>   Home Attendant Program and United Jewish
>   Council of the East Side Home Attendant
>   Service Corporation)

JACKSON LEWIS P.C.
   Douglas J. Klein, Esq., Of Counsel
   Felice B. Ekelman, Esq., Of Counsel
   Ryan C. Chapoteau, Esq., Of Counsel
   Eric P. Simon, Esq.
   (for The First Chinese Presbyterian Community
   Affairs Home Attendant Corporation, AccentCare of
   NY, Inc., Alliance for Health, Inc., Azor Home
   Care, Bushwick Stuyvesant Heights Home Attendants,
   Inc., CABS Homecare, RiverSpring Licensed Homecare
   Services Agency, Inc., St. Nicholas Human Supports
   Corporation, The Wartburg Residential Community,
   Inc. d/b/a No Place Like Home, Rockaway Home
   Services, Inc., School Settlement Home Attendant
   Services Corp.

LITTLER MENDELSON, P.C.
   Lisa M. Griffith, Esq., Of Counsel
   Ira D. Wincott, Esq., Of Counsel
   (for Region Care, Inc.)

LOCKE LORD, L.L.P.
   Richard J. Reibstein, Esq., Of Counsel
   (for Special Touch Home Care Services, Inc.)

MILMAN LABUDA LAW GROUP, P.L.L.C.
   Robert F. Milman, Esq., of Counsel
   (for RAIN Home Attendant Services Inc.)

PECKAR & ABRAMSON, P.C.
   Gregory R. Begg, Esq., Of Counsel
   (for ABC Health Services Registry, Inc., Prestige
   HomeCare, Inc., Prestige Home Attendant Inc.
   d/b/a All Season Home Attendant, Personal Touch
   Home Care of N.Y., Inc., Personal Touch Home Care
   Of LI, Inc., Personal Touch Home Care of
   Westchester, Inc., People Care, Inc.)

SCHULTE ROTH & ZABEL
   Scott A. Gold, Esq., Of Counsel
   Mark E. Brossman, Esq., Of Counsel
   (co-counsel for Chinese-American Planning Council
   Home Attendant Program)
   (for Bronx Jewish Community Council Home

2

Attendant Services, Home Care Services for
Independent Living, CIDNY Independent Living
Services, Inc., New York Foundation for Senior
Citizens Home Attendant Services, Cooperative Home
Care Associates, Rise Borough Home Care, Inc.,
FEGS Home Attendant Services, Home Health
Management Services Inc., Family Home Care of
Brooklyn and Queens)

HOLLAND & KNIGHT, L.L.P.
  Frederick D. Braid, Esq. Of Counsel
  (for People Care, Inc.)

JOHN LEWIS BROWN, P.L.L.C.
  John L. Brown, Esq., Of Counsel
  (for Alliance Home Services, Inc.)


**For the Union**
LEVY RATNER, P.C.
  Laureve D. Blackstone, Esq., Of Counsel
  Kimberly A. Lehman, Esq., Of Counsel

GLADSTEIN REIF & MEGINNISS, L.L.P.
  James Reif, Esq., Of Counsel

**Other Appearances**
JOSEPH & NORINSBERG, L.L.C.
  Michael R. Minkoff, Esq., Of Counsel
  (for individual Plaintiff Mercedes Pena, represented
  by the firm in pending litigation against The First
  Chinese Presbyterian Community Affairs Home
  Attendant Corp.)

WITTELS LAW, P.C.
  Steven L. Wittels, Esq., Of Counsel
  J. Burkett McInturff, Esq., Of Counsel
  Steven D. Cohen, Esq.
  (for individuals and proposed classes represented by
  the firm in pending and potential home care
  litigation)


**Before**: Martin F. Scheinman, Esq., Arbitrator

## BACKGROUND

This grievance protests the alleged underpayment of wages to home health care workers by forty two (42) home health care agencies (referred to collectively as "Employers"). The Union insists the Employers, among other things, violated applicable wage and hour laws, rules and regulations, by underpaying current and former employees on twenty four (24) hour cases and other assigned work, and by failing to comply with applicable wage notice requirements. It asks the affected employees be made whole, with applicable interest and attorneys' fees.

Most of the underlying facts are not disputed.

On January 2, 2019, the Union filed a class action grievance on behalf of its more than one hundred thousand (100,000) current and former home care bargaining unit members employed by Employers with whom the Union has collective bargaining agreements.[1] Those Employers are: 1) ABC Health Services Registry, Inc., 2) AccentCare of NY, Inc., 3) Alliance for Health, Inc., 4) Alliance Home Services, Inc.,

---

[1] During these proceedings, the parties advised me there were approximately one hundred and ten thousand (110,000) employees with claims when the grievance was filed, and that number may now have grown to more than one hundred twenty thousand (120,000).

5) Azor Home Care, 6) Bronx Jewish Community Council Home Attendant Services, 7) Bushwick Stuyvesant Heights Home Attendants Inc., 8) CABS Home Attendants Service, Inc., 9) Care at Home, 10) Chinese-American Planning Council Home Attendant Program, Inc., 11) CIDNY Independent Living Services, Inc., 12) Cooperative Home Care Associates, 13) Family Home Care of Brooklyn and Queens, 14) FEGS Home Attendant Services, 15) First Chinese Presbyterian Community Affairs Home Attendant Corp., 16) Home Care Services for Independent Living, 17) Home Health Management Services, Inc., 18) New Partners Inc. d/b/a Partners in Care, 19) New York Foundation For Senior Citizens Home Attendant Services, 20) Personal Touch Home Care of N.Y., Inc., 21) Personal Touch Home Care of Long Island, Inc., 22) Personal Touch Home Care of Westchester, Inc., 23) People Care, Inc., 24) Premier Home Health Services, Inc., 25) Prestige Home Attendant Inc. d/b/a All Season Home Attendant, 26) Prestige Home Care, Inc., 27) Priority Home Care, Inc., 28) PSC Community Services, Inc., 29) RAIN Home Attendant Services, Inc., 30) Region Care, Inc., 31) Richmond Home Needs, 32) Rise Borough Home Care, Inc., 33) RiverSpring Licensed Home Care Services Agency, Inc., 34) Rockaway Home Services, Inc., 35) School Settlement Home

Attendant Services Corp., 36) Special Touch Home Care Services, Inc., 37) St. Nicholas Human Support Corp., 38) Stella Orton Home Care Agency, Inc., 39) Sunnyside Citywide Home Care Services, 40) Sunnyside Home Care Project, 41) United Jewish Council of the East Side Home Attendant Service Corp. and 42) The Wartburg Residential Community, Inc. d/b/a No Place Like Home.[2]

The Union's agreements with the Employers contain an alternative dispute resolution clause (hereinafter, "ADR article") adopted in a memorandum of agreement signed in late 2015 – early 2016 (hereinafter, the "2015 MOA") for resolution of all claims brought by either the Union or employees asserting violations of the Fair Labor Standards Act ("FLSA"), the New York Home Care Worker Wage Parity Law ("WPL"), or provisions of the New York Labor Law and regulations (collectively, the "covered statutes"). The ADR article, set forth below, prescribes mandatory mediation of claims before proceeding to binding arbitration.

Pursuant to the ADR article, a mediation was held in an effort to settle issues underlying the parties' dispute. Some attorneys representing employees on individual and class

---

[2] Joint Stipulation

6

claims as plaintiffs in pending court cases also participated. Formal mediation sessions were conducted on February 11, 2019, June 4, 2019, and September 12, 2019. The mediation reached an impasse and concluded without settlement. A telephone conference with the parties was held on December 18, 2019, regarding jurisdiction and arbitrability issues. On December 24, 2019, I declared the mediation complete and the parties proceeded to binding arbitration.

On December 24, 2019, a scheduling order was issued, granting the parties leave to submit briefs on threshold issues to be argued orally on the first day of hearing. Those issues concerned arbitrability, jurisdiction and the role to be played by counsel for individual plaintiffs belonging to a collective or putative class. Briefs on those issues were then submitted.

A hearing was held on January 15, 2020, at the offices of Schulte, Roth & Zabel in New York City. A stenographic record of the hearing was taken. During the hearing, the parties were afforded full opportunity to present evidence and argument in support of their respective positions. They did so. At the close of the hearing, the parties were granted

7

leave to amend their earlier submissions and file responses to the briefs of other parties. Upon my receipt of the parties' additional submissions, I declared the record closed.

On February 24, 2020, I reopened the record at the parties' request to allow submission of additional court decisions. Upon my receipt of those decisions, I again declared the record closed.

On April 17, 2020, I issued an Award on jurisdictional issues, holding, in pertinent part,

> 1.   The claims encompassed by the wage and hour related grievances involving current and former 1199 bargaining unit members, including those arising under federal, state and local law, are arbitrable.
>
> 2.   I have jurisdiction to adjudicate the claims asserted in the wage and hour grievances, arising under federal, state and local law, filed by the parties to the Collective Bargaining Agreement which encompass all claims arising under the federal, state and local laws named in the Agreement, as well as any pending litigation or administrative actions on the identical claims, irrespective of whether employees' employment terminated prior to the effective date of the Memorandum of Agreement providing Alternative Dispute Resolution language for exclusive mediation/arbitration procedures for wage and hour disputes pursuant to the Agreement between the parties.

In my said Award, I also designated the law firm, Wittels Law
P.C., as Plaintiffs' Coordinating Counsel under limited
conditions specifying the firm a) will not be co-counsel with
the Union, b) will consult with the Union at such times and
on such issues as the Union deems appropriate, c) will be the
Union's primary contact for communication with private
Plaintiffs' counsel, d) will be allowed to attend in-person
proceedings conducted before me, (e) will have a limited right
to make presentation(s) at in-person proceedings, if any,
conducted before me as may be consented to by the Union,
subject to Employers' objections, (f) will have no
independent right to examine particular witnesses or
introduce evidence, but may ask the Union to consider
Coordinating Counsel's request(s) to do so, subject to
Employers' objections, (g) shall have no formal authority to
initiate, coordinate or conduct pre-hearing discovery or any
right to negotiate stipulations, settlements or other matters
with either the Union or the Employers and, (h) shall have
the right to make written submissions on behalf of individual
Plaintiffs they actually represent.

Thereafter, following a July 2, 2020, conference call,
I issued an Order granting the Union's request for discovery

9

by requiring each Employer produce the number of service hours worked by the employees in each calendar year, the number of overtime hours worked by employees in each calendar year, the number of 24-hour shifts by employees per calendar year and the cumulative number of all such cases, sample wage notices and when notices became compliant with relevant laws, sample wage statements and when these statements became compliant with relevant laws, information demonstrating the Employers' ability to pay; and the number of employees employed before and after the effective date of the Memorandum of Agreement providing for exclusive mediation/arbitration procedures for wage and hour disputes between the parties. I directed relevant information be exchanged consistent with my Order.

As a result, document production was made and the parties conferred over how best to present their cases. Ultimately, as a means of expediting this proceeding, they agreed to present a joint stipulation of global facts, defenses and arguments.

On or about March 26, 2021, the parties submitted a joint stipulation setting forth a) undisputed facts common to all of the Employers, b) facts disputed by the parties, and c) affirmative and other defenses asserted by the Employers with

10

legal argument and the Union's responses thereto. The joint stipulation allowed individual employers to supply addenda reciting facts and/or defenses unique to a particular employer and providing individualized facts as to such Employer's practices, including whether and to what extent their practices and facts differ from the statement of undisputed facts. The parties agreed individual employers would have the right to address facts pertinent to their practices, even if those facts differ from the stipulated facts.

In response, twenty one (21) Employers filed addenda to the joint stipulation, setting forth stipulated facts, disputed facts, and defenses specific to their companies, along with the Union's responses. Each addendum was signed by the individual Employer and the Union.[3]

---

[3] The following Employers filed addenda to the joint stipulation: AccentCare of NY, Inc., Alliance for Health, Inc., Azor Home Care, Bushwick Stuyvesant Heights Home Attendants, Inc., CABS Home Attendants Service, Inc., Chinese-American Planning Council Home Attendant Program, Inc., First Chinese Presbyterian Community Affairs Home Attendant Corp., New Partners Inc. d/b/a Partners in Care, Personal Touch Home Care of Long Island, Inc., Personal Touch Home Care of NY, Inc., Personal Touch Home Care of Westchester, Inc., Premier Home Health Services, Inc., PSC Community Services, Inc., Priority Home Care, Inc., RAIN Home Attendant Services, Inc., Riverspring Licensed Homecare Services Agency, Inc., Special Touch Home Care Services,

In their joint stipulation, the parties acknowledge each
Employer has had a Collective Bargaining Agreement with the
Union since at least 2012. They agree this arbitration covers
all claims under the covered statutes by employees of each
Employer from the earlier of January 2, 2013, or the earliest
date from which any individual or class claims against
Employers seek relief, through today, (the "relevant
period"), except for claims by those individual plaintiffs
against certain Employers which were carved out from this
proceeding by my April 17, 2020, Award or elsewhere.[4]

The January 2, 2019, grievance asserted claims employees
were not properly paid on twenty four (24) hour cases, and
any other outstanding wage and hour claims, including but not

---

Inc., St. Nicholas Human Support Corporation, Stella Orton
Home Care Agency, Inc., Sunnyside City Wide Home Care
Services, Sunnyside Home Care Project, United Jewish Council
of the East Side Home Attendant Corp., The Wartburg
Residential Community, Inc. d/b/a no Place Like Home.
[4] In my April 17, 2020, Award, I ruled my decision would not
be binding upon the following individuals in light of court
rulings holding their wage and hour claims not subject to
arbitration: Alvaro Ramirez Guzman, Elida Agustina Mejia
Herrera, Leticia Panama Rivas, Boris Pustilnik, Maral
Agarunova, Epifania Hichez, Carmen Carrasco and Seferina
Acosta. Thereafter, I so ordered a May 29, 2020, agreement
between the Union and Alliance for Health, confirming another
individual, Eugenia Barahona Alvarado, is not bound by my
April 17, 2020, Award.

limited to, any pending litigation or administrative actions on the identical claims asserted.

Six (6) categories of claims are presented in this arbitration: 1) Claims for minimum pay and benefit rates on Medicaid funded assignments pursuant to the New York Home Care Worker Wage Parity Law, 2) Claims for spread of hours premiums under the New York Minimum Wage Order for Miscellaneous Industries and Occupations, 12 N.Y.C.R.R. Part 142) (hereinafter, the "New York Minimum Wage Order), 3) Claims for overtime compensation under the FLSA, 4) Claims for pay for interruptions of sleep and meal periods occurring during 24-hour shifts, pursuant to New York's Minimum Wage Order as interpreted by the New York State Department of Labor, 5) Claims for travel time and pay, and 6) Claims for wage notice and wage statement violations under New York's Wage Theft Prevention Act, New York Labor Law §§195(1), 195(3).

As to claims under the New York Home Care Worker Wage Parity Law ("WPL"), the parties acknowledge the WPL establishes minimum pay and benefit rates for all episodes of care reimbursed in whole or part by the New York State medical assistance program, including Medicaid care plans and

13

programs of all-inclusive care for the elderly. Although they agree the Employers provided wages and benefits during the relevant period consistent with their Collective Bargaining Agreements, the Union raised an issue in February of 2018 about a shortfall in pay rates required by the WPL.

Thereafter, several Employers retroactively cured any WPL shortfall through provisions adopted in subsequent memoranda of agreement, but others did not. The Union claims violations occurred for the period January 1, 2014, through December 31, 2017. However, in addenda to the joint stipulation, it has agreed for all time periods relevant to this arbitration, certain Employers made payments to their employees in compliance with the WPL and have no shortfall or liability for WPL claims in this proceeding.

As to claims under the New York Labor Law for spread of hours payment, the parties acknowledge under the New York Minimum Wage Order, employees whose shifts extend over a period of more than ten (10) hours must be paid an extra hour at the New York State minimum wage rate. They agree an Employer is not required to provide an extra hour of pay if the amount paid to the employee for the workweek equals or exceeds the State minimum and applicable overtime wage rates

14

for all hours worked plus one (1) hour of pay at the State minimum wage rate for each day in which the employee worked more than ten (10) hours.

The parties have stipulated at all times during the relevant period prior to January 1, 2017, the base rate set forth in their Collective Bargaining Agreements was sufficient to cover spread of hours pay for all employees working shifts more than ten (10) hours, whether continuous or because of two (2) shifts in the same day where the beginning and end times spread over a period of greater than ten (10) hours. They agree where Employers paid the rate negotiated in their Collective Bargaining Agreements, the Employers complied with the spread of hours requirements under the CBA and New York Labor Law for the period of time prior to January 1, 2017. No claims are made by the Union of any violation of spread of hours requirements prior to January 1, 2017.

However, the parties acknowledge effective January 1, 2017, the minimum wage rate in New York City increased to eleven ($11) dollars per hour pursuant to the New York Labor Law. From that date forward, they agree Employers were obligated to make spread of hours payments consistent with

15

the New York Minimum Wage Order unless that Employer was exempt or paid an hourly rate sufficiently higher than the minimum wage.

The Union has agreed the following sixteen (16) Employers are exempt from having to make spread of hours payments, by virtue of their having received an exemption from the requirements of the New York Minimum Wage Order and their having provided a copy of the "statement of Non-Profitmaking Institution" certification to the Union: Bronx Jewish Community Council Home Attendant Services, Inc., Bushwick Stuyvesant Heights Home Attendants Inc., CABS Home Attendant Service Inc., CIDNY Independent Living Services, Inc., Family Home Care Services of Brooklyn and Queens, First Chinese Presbyterian Community Affairs Home Attendant Corp., Home Care Services for Independent Living, New York Foundation for Senior Citizens Home Attendant Services, Inc., PSC Community Services, RAIN Home Attendant Services, Inc., Rise Borough Homecare, Inc., St. Nicholas Human Support Corp., Stella Orton Home Care Agency, Inc., Sunnyside City Wide Home Care Services, Sunnyside Home Care Project, United Jewish Council of the East Side Home Attendant Services Corp.

16

As to claims related to overtime rates between January 1, 2015, and October 12, 2015, the parties stipulate prior to 2015, employees were considered subject to the "companionship exemption" under the FLSA because no more than twenty (20%) percent of their total weekly hours was devoted to general household work not incidental to fellowship, care or protection of the client. They agree under the New York Labor Law, unless otherwise exempted, employees falling under the FLSA companionship exemption were to be paid time 1.5 times the New York minimum wage rate for overtime hours.

Effective January 1, 2015, a Final Rule adopted by the U.S. Department of Labor ("DOL") removed the FLSA companionship exemption for agencies such as these Employers. The parties agree such Final Rule was the subject of litigation which resulted in an August 21, 2015, ruling by the U.S. Court of Appeals for the District of Columbia Circuit, affirming the validity of the Final Rule.[5] The Court's mandate issued on October 13, 2015. The parties stipulate prior to October 13, 2015, enforcement of the Final

---

[5] *Home Care Ass'n of Am. V. Weil*, 799 F.3d 1084 (D.C.Cir. 2015), cert. denied, 136 S.Ct. 2506 (2016).

17

Rule was held in abeyance by the U.S. Department of Labor and the New York State Department of Labor.

The parties agree between January 1, 2015, and October 12, 2015, the Employers did not pay overtime at time and one-half employees' regular rate within the meaning of the FLSA. According to the Employers, changes to the FLSA companionship exemption did not become effective until October 13, 2015, at the earliest, and the U.S. Department of Labor did not begin enforcing its Final Rule until November 12, 2015.   In the Employers' view, they reasonably believed they were not obligated to make overtime payments prior to November 12, 2015. They assert the Final Rule was enjoined nationwide by a federal district court in December 2014 and was not enforceable at that time, pending appeal to the D.C. Circuit. The Employers claim reliance was placed in good faith upon the foregoing policies and upon public statements from the U.S. Department of Labor and New York State Department of Health in deciding not to make overtime payments during the period in question. According to the Union, however, no public statement was made by the New York State Department of Health relieving the Employers of the obligation to pay overtime with federal funding allocated for home health aides for any

18

period prior to October 13, 2015. The Union asserts the bulk of authority in the Second Circuit required payment of overtime under the FLSA starting on January 1, 2015.

Effective October 13, 2015, the parties' MOA required an employee who works more than forty (40) hours in a workweek will be paid overtime pay at 1.5 times the employee's regular rate, for hours worked in excess of forty (40) during such week. The Union agrees all Employers filing addenda to the joint stipulation began paying overtime at 1.5 times the employee's regular rate, on various dates between October 13, 2015, and January 2016, except for one. (Addenda to joint stipulation).

As to claims regarding minimum wage and/or overtime due to interruptions of 24-hour shifts (also referred to by the parties as "live-in" or "sleep in" shifts), the parties stipulate employees working 24-hour shifts are subject to the so-called, "13 Hour rule", which permits the payment of thirteen (13) hours of the 24-hour shift so long as employees receive eight (8) hours of sleep (five [5] of which are uninterrupted by the client) and three (3) one (1) hour meal breaks. They agree this rule is authorized by federal regulations and by an opinion of the New York State Department

19

of Labor. The parties acknowledge the opinion of the New York
State Department of Labor was challenged in court and set
aside by several Appellate Division rulings later reversed by
a March 26, 2019, decision of the New York Court of Appeals
in *Andryeyeva v. New York Health Care, Inc.*, 33 N.Y.3d 152
(2019). There, the Court of Appeals ruled deference must be
given to the opinion's sleep and mealtime exemptions, which
apply to all employees regardless of their residential
status. While *Andryeyeva* was pending at the Court of Appeals,
it is stipulated the New York State Department of Labor
recommended Employers continue staffing and covering twenty
four (24) hour cases in accordance with its interpretation
and emergency guidelines advising the thirteen (13) hour rule
was valid.

The parties agree the level of care for each client is
determined by the payor (i.e., the Medicaid managed care plan
or managed long-term care plan), on a case-by-case basis,
according to the client's nighttime needs, degree of
assistance needed with toileting, walking, transferring or
feeding, and the frequency of these needs. Where a client
truly needs continuous care for twenty four (24) hours of the
day, continuous care may be sought with two (2) aides for

20

twelve (12) hours each ("split shifts") in order to meet the requirement the assigned aide be alert and available at all times. For cases assigned to 24-hour "live in" shifts, it is agreed a health provider has made a determination the client does not require continuous care over the course of twenty four (24) hours.

The parties stipulate during the relevant period, the Employers required employees to track and report their working time and provided automated systems and policies to that end. Employees' wages, including overtime, are calculated based upon the working time reported by the employees.

Since at least the time they signed the 2015 MOA, all of the Employers maintained a policy or procedure for employees to report interrupted sleep and meal periods ("24-hour procedures") and for employees to be paid for any sleep or meal periods interrupted by the client. The purpose of these procedures was to ensure employees were timely paid for any sleep and/or meal breaks interrupted by a client and to ensure the accurate reporting of interrupted sleep and meal breaks. According to the Employers, to the extent employees had interrupted sleep or meal periods during 24-hour shifts and

21

were unpaid, this was not the result of any uniform policy or practice. According to the Union, however, even if such non-payment did not stem from a policy or practice, the Employers are nevertheless liable for interrupted sleep and/or meal periods.

The parties stipulate prior to the 2015 MOA, some of the Employers had memoranda of understanding specifically addressing twenty four (24) hour cases and providing employees assigned to "live-in" cases shall be paid a minimum of twelve (12) hours per day plus a $16.95 per diem premium, with part time off to be credited based upon a twelve (12) hour workday. It is agreed employees were paid in accordance with this provision prior to their Employer's adoption of the 2015 MOA.

With the 2015 MOA, the parties provided for reporting of work interruptions on 24-hour cases to be made to a case coordinator at the completion of the case. They agreed employees would be allowed eight (8) hours of unpaid sleep time and three (3) hours of unpaid, duty-free mealtime or break periods. Under the 2015 MOA, employees assigned to a client as a "sleep-in" case (a 24-hour shift assignment with a client) would be paid at least ten ($10) dollars per hour

22

for all hours worked, excluding eight (8) hours of unpaid sleep time and three (3) hours of unpaid duty-free mealtime or break periods. Employees working a sleep-in case were now required to report instances where the employee was unable to receive at least five (5) hours uninterrupted sleep time from being called to duty during the employee's eight (8) hour sleep time. Such employees would also be required to report instances where a full, three (3) hours of duty-free mealtime or break periods could not be had because called to duty during mealtime or break periods. The parties acknowledge many employees work for other home health agencies also covered by a Collective Bargaining Agreement with the Union, and may have continued to work for such other Employers after the effective date of the 2015 MOA.[6]

As to claims related to travel time and pay, the parties agree under the terms of the 2015 MOA, if an employee works two (2) or more cases in a single day, travel time between case assignments constitutes hours worked.   However, an

---

[6] The Union and those Employers filing addenda to the joint stipulation have agreed, to the extent set forth in their addenda, to the dates when those Employers implemented twenty four (24) hour procedures for employees to report interruptions to sleep and meal periods during 24-hour shifts.

employer is not required to pay travel time between case assignments if the cases are assigned by different Employers. Prior to the 2015 MOA, the Union had not negotiated a travel time payment provision in its Collective Bargaining Agreement with the Employers, and no contractual obligation to pay aides for travel time existed.[7]

As to claims related to wage notices, the parties acknowledge under the Wage Theft Prevention Act, ("WTPA"), Employers are required to provide employees with notice ("wage notice") containing information required by the statute, within ten (10) business days of their first day of employment, and must obtain a signed and dated written acknowledgement of receipt of the notice. They agree the WTPA gives a private right of action to an employee whose Employer fails to provide the initial notice upon their hiring, but not for subsequent failures to furnish the annual notice in following years.

---

[7] In addenda to the joint stipulation, the Union has agreed certain Employers have no liability for unpaid travel time during their coverage period, because they paid travel time since 2012. It also agrees other Employers who filed addenda to the joint stipulation began paying travel time on the dates set forth in their addenda, which range generally from late 2015 to January of 2020, depending upon the Employer.

24

The WTPA also requires Employers to provide each employee a statement ("wage statement") with every payment of wages, listing dates of work for which payment is being made, the employee's name, the Employer's name, address and phone number, the rate(s) of pay and basis therefor, gross wages, deductions, allowances claimed as part of the minimum wage, and net wages.[8]

According to the Employers, responsibilities for servicing clients varied greatly, with multiple clients each having different care plans, needs, sleep and meal break circumstances, travel time requirements, and scheduling. They assert policies and practices were not uniform and differed amongst the Employers.

According to their addenda to the joint stipulation, the following Employers claim an inability to pay a substantial monetary remedy if awarded against them because such a remedy would threaten the viability of their business: Bushwick Stuyvesant Heights Home Attendants, Inc., CABS Home Attendants Service, Inc., Chinese-American Planning Council

---

[8] The Union and those Employers filing addenda to the joint stipulation have stipulated, to the extent set forth in their addenda, to the dates when those Employers began complying with the wage notice and or wage statement requirements of the New York Labor Law.

Home Attendant Program, Inc., RAIN Home Attendant Services,
Inc., Riverspring Licensed Home Care Services Agency, Inc.,
St. Nicholas Human Support Corporation, United Jewish Council
of the East Side Home Attendant Corp., and The Wartburg
Residential Community, Inc. d/b/a No Place Like Home.  These
Employers have submitted financial documentation, including
tax returns and or IRS Form 990, in support of their claimed
inability to pay a substantial monetary award. A further claim
has been made the Employers should be permitted to pay off
any obligations under the award over time, due to alleged
business downturns from the COVID-19 pandemic. According to
the Union, the documentation submitted is not sufficient to
verify an inability to pay nor justification for a payment
plan, which the Union insists is not a defense to the
employees' claims in any event.

**DISCUSSION AND FINDINGS**

**The Issues:**

The parties were unable to agree upon a precise statement
of the issues to be decided. They have authorized me to
formulate the issues in my Award.

The basic issues to be decided are as follows:

1. Have the Employers violated the Collective Bargaining
   Agreement by failing to pay employees as required by

26

the New York State Home Care Worker Parity Law ("WPL"), the Fair Labor Standards Act, the New York Labor Law and other applicable federal, state or local wage and hour laws or regulations, by failing to pay a) minimum rates of total compensation required by the WPL, b) overtime pay, c) spread of hours pay, d) pay for interruptions of sleep and meal time on twenty four (24) hour cases, e) travel time pay, and by f) failing to provide requisite statutory wage notices and statements?

2. If so, what shall be the remedy?

## Relevant Contractual Provisions

### ADR ARTICLE, 2015 MOA

1. **The parties agree a goal of this Agreement is to ensure compliance with all federal, state and local wage hour law and wage parity statutes. Accordingly, to ensure the uniform administration and interpretation of this Agreement in connection with federal, state and local wage-hour and wage parity statutes, all claims brought by either the Union or Employees, asserting violations of or arising under the Fair Labor Standards Act ("FLSA"), New York Home Care Worker Wage Parity Law, or New York Labor Law (collectively, the "Covered Statutes"), in any manner, shall be subject exclusively, to the grievance and arbitration procedures described in this Article. The statute of limitations to file a grievance concerning the Covered Statutes shall be consistent with the applicable statutory statute of limitations. All such claims if not resolved in the grievance procedure, including class grievances filed by the Union, or mediation as described below shall be submitted to final and binding arbitration before Martin F. Scheinman, Esq. The Arbitrator shall apply appropriate law and shall award all statutory remedies and penalties, including attorneys' fees, consistent with the FLSA and New York Labor Law in rendering decisions regarding disputes arising under this Article.**

2. **Whenever the parties are unable to resolve a grievance alleging a violation of any of the Covered Statutes, before the matter is submitted to arbitration, the dispute**

shall be submitted to mandatory mediation. The parties hereby designate Martin F. Scheinman, Esq., as Mediator for such disputes. Such mediation shall be requested no more than thirty (30) calendar days following exhaustion of the grievance procedure. Following submission of the dispute to mediation, the parties with the assistance of the Mediator shall establish such procedures as shall expeditiously advance the mediation process, including the scheduling of the exchange of relevant information, submission of position statements, and dates for mediation. In the absence of an agreement, the Mediator shall determine such procedures. Once the matter has been submitted to mediation, the Employer shall be obligated to produce relevant documents as requested by the Union and any objections to production shall be ruled on by the Mediator. The fees of the Mediator shall be shared equally by the Union and the Employer.

3. No party may proceed to arbitration prior to completion of the mediation process as determined by the Mediator. In the event the Union seeks arbitration of a grievance subject to these procedures, the Union shall submit its demand for arbitration to the Employer and the Arbitrator within four (4) months following the Mediator's declaration that mediation has concluded. The Employer shall be obligated to produce relevant documents as requested by the Union and any objections to production shall be ruled on by the Arbitrator. Prior to hearing, if noticed, the Union shall also be entitled to depositions of relevant witnesses. The fees of the Arbitrator shall be shared equally by the Union and the Employer. The Employer shall upon notice be entitled to take the deposition of any Employee seeking relief in such arbitration or any other relevant witness.

4. In the event an Employee has requested, in writing, that the Union process a grievance alleging a violation of the Covered Statutes and the Union declines to process a grievance regarding alleged violations of the Covered Statutes, through the grievance/mediation process or to arbitration following the conclusion of mediation, an Employee solely on behalf of herself, may submit her individual claim to mediation, or following the conclusion of mediation, to arbitration. Written notice of the Employee's submission of the dispute to mediation and/or arbitration must be provided to the Employer, the Union, and the

28

Mediator/Arbitrator within thirty (30) calendar days of written notice from the Union, as measured by postmark date, email date, facsimile date, or delivery/attempted delivery date (if such notice is served by overnight delivery service), that it has declined to process the dispute to mediation and/or arbitration. Such claims may be presented by and on behalf of the individual Employee only, with or without counsel. The Mediator/Arbitrator shall have no authority to consider class or collective claims or issue any remedy on a class basis. The fees and expenses of the Mediator/Arbitrator shall be shared equally by the employee and the Employer, unless the Arbitrator finds a violation of any of the Covered Statutes, in which case the Employer shall pay the fees and expenses of the Arbitrator.

*   *   *   *   *   *   *

## Positions of the Parties

The Union argues its class grievance is meritorious. It contends current and former employees of its bargaining units with the Employers were underpaid monies owed under the covered statutes and should be made whole.

The Union maintains the wage and hour provisions of the covered statutes protect home care workers by establishing minimum wage, overtime and other standards for the industry. It alleges these protections are mandatory. The Union asserts there is little dispute as to the operative facts. It asks for a remedy commensurate with the violations claimed in this proceeding.

29

The Union argues its class grievance was filed pursuant to the Agreement and is not subject to pleading or class certification requirements for class actions brought in a court. It disputes the Employers' contention the claims of these employees lack common issues of law or fact or that such common issues do not predominate over individual issues. The Union alleges any requirements of commonality or typicality under federal class actions apply only to cases brought in federal court and are not applicable to its grievance filed pursuant to the Agreement.

The Union claims the Employers are liable for violations where they had reason to know of the activity of their employees, including hours worked and other relevant information. It alleges they have a non-delegable duty to maintain accurate time records, and questions whether the Employers did so. The Union urges if accurate records were not kept, the Employers would bear the burden of proving no violations occurred.

The Union disputes the notion equitable defenses may be raised by the Employers under the covered statutes. It contends equitable defenses to legal claims are not permissible under the FLSA, WPL, or New York Labor Law.

Therefore, the Union maintains, any equitable defenses asserted by the Employers in this proceeding, including but not limited to estoppel, laches, or waiver, should be rejected. It asserts the only relevant defense is whether a claim was timely presented within the statute of limitations.

The Union acknowledges Employers holding non-profit exemptions from the New York State Minimum Wage Order are exempt from the obligation to make spread of hours or overtime payments under New York Labor Law. It agrees those Employers producing copies of their exemptions have no liability for such payments.

The Union disputes the Employers' contention their alleged failure to pay overtime from January to October or November of 2015 is excused by their good faith reliance a regulation or enforcement policy of the Wage and Hour division of the U.S. Department of Labor. It maintains the Employers have not established such reliance as an affirmative defense, either objectively or subjectively. The Union contends even if such reliance were established, it would not excuse the Employers from making wage payments otherwise required by state and or federal law, including overtime retroactive to January 1, 2015. The Union disputes the Employers' assertion

31

no willful violations occurred or that any claims are barred by the statute of limitations. The Union disagrees there was split amongst certain lower federal courts as to whether the U.S. Department of Labor's revision of the companionship exemption went into effect on January 1, 2015, or on October 13, 2015. It maintains the lower federal courts in the Second Circuit found the Final Rule took effect January 1, 2015. The Union insists an emergency regulation adopted by the New York State Department of Labor while the Final Rule was being litigated in the courts provides no basis for the Employers to avoid liability for failing to pay employees for interrupted sleep or meal periods during 24-hour assignments.

The Union does not dispute wage and benefit provisions were negotiated in the Collective Bargaining Agreements which the Union then believed were in compliance with the WPL. Nevertheless, it maintains these facts are not defenses to its claim the Employers violated the WPL.

The Union argues as a matter of law, the Employers' claimed inability to pay a substantial monetary amount to satisfy claims in this proceeding is not a defense. It also contends the financial information provided by the Employers,

even if accepted as true, does not warrant a finding of inability to pay these claims.

The Union argues travel time pay for traveling between multiple assignments in a day is compensable under federal and state law. It rejects the Employers' contention employees are ineligible for such pay because they volunteered to work for a second client. The Union urges employees have no choice but to accept multiple assignments in a single day in order to make a living, and are not free to leave or engage in personal pursuits while traveling from client-to-client.

The Union disputes the Employers' assertion any violations were isolated and technical in nature and excused by the doctrine of substantial compliance. It maintains substantial compliance is not a defense to claims presented under the covered statutes. The Union argues the Employers' claim of a good faith basis for believing their underpayment of wages complied with applicable law is not established and not a defense to the violations alleged in this proceeding. It agrees other cases brought in federal court have settled for less than the full value of plaintiffs' claims, but insists such settlements are not a defense to its claims in this proceeding. The Union acknowledges federal statutes

33

prescribe certain affirmative defenses to FLSA claims, but disputes these Employers can validly assert such defenses.

The Union acknowledges one (1) of the Employers, PSC Community Services, Inc., has requested a credit against any liability which might be awarded against it in this proceeding, for monies previously paid to the New York State Department of Labor in the sum of $28,388.96 to cure wage underpayments detected during an audit for the period June 30, 2013, to April 24, 2016. It opposes the requested credit.

Without prejudice to the foregoing positions, the Union acknowledges there are more than one hundred thousand (100,000) current or former employees with claims in this proceeding. It recognizes there are substantial obstacles to litigating such a large number of claims on an individual basis and suggests doing so would take an extended period of time, leaving each employee with a long period of delay while the employee's case is scheduled, heard and decided. Given these realities, the Union is not opposed to a remedy, should liability be found, which establishes a fund to compensate all affected employees at a dollar level which fairly compensates them for their losses according to a formula to be devised. In the Union's view, such a remedy will also

34

benefit the employees by assuring certainty and ease of collection.

As to the formula to be devised, the Union acknowledges its claims involve both 24-hour shift claims and others not involving performance of 24-hour shifts. It proposes any fund established to pay the employees' claims be allocated, sixty five (65%) percent of the pool for 24-hour shift claims, and thirty five (35%) percent of the pool for all other claims.[9] The Union has devised a mathematical methodology to distribute the monies within the pool.

As to the portion of the pool for 24-hour shift claims, the Union asks (i) eighty (80%) percent of this portion of the pool be applied to shifts worked between January 2013 (or for those Employers whose relevant periods begin earlier than January 2013, the earlier date when their relevant period begins) through December 31, 2016, and twenty (20%) percent to shifts worked between January 1, 2017, through October 31, 2021. The Union asks the portion of the pool for 24-hour shift claims be distributed consistent with equations it submitted.

---

[9] The parties have variously referred to 24-hour shifts worked by an aide as "24-hour shifts", "live-in" shifts, and "sleep-in" shifts. For ease of presentation, I refer to these as "24-hour shifts".

As to the portion of the pool for all other claims (i.e., those which are not 24-hour shifts), the Union asks (i) eighty (80%) percent of this portion of the pool be allocated to hours worked between January 2013 (or for those Employers whose relevant periods begin earlier than January 2013, the earlier date when their relevant period begins) through December 31, 2016) through December 31, 2016, and twenty (20%) percent to hours worked between January 1, 2017, through October 31, 2021. The Union asks this portion of the pool be distributed consistent with equations they submitted.

As to the cutoff date for interrupted sleep and meal periods of employees assigned to live-in shifts, the Union argues the cutoff should be December 31, 2016. It contends a number of Employers did not implement a mechanism for reporting these interruptions until 2016, warranting the December 31, 2016, cutoff date.

The Union agrees with the Employers upon the contents of a proposed notice and claim form, and requests the form be attached to and incorporated in my Award. It asks any payments made to employees from the fund be attributed fifty (50%) percent to wages (inclusive of required payroll taxes) and fifty (50%) percent to non-wage income (interest and

36

liquidated damages) so each aide will receive two (2) checks from any agency for whom the aide worked during the relevant time period. The Union requests the checks be aggregated. It proposes each aide who timely provides a claim form should receive a minimum payment of ten ($10) dollars, subject to the foregoing apportionment for wage v. non-wage income.

The Union contends upon a finding the Employers violated the covered statutes, the Employers should pay the arbitrator's fees and expenses and the Union's attorneys' fees and expenses. The Union asserts any attorney fees paid to the Union will be returned to the pool for distribution to its members. It asks expenses incurred by the Union in establishing a hotline with additional staff to answer members' questions in this matter be defrayed by awarding the Union up to sixty thousand ($60,000) dollars, to be paid to the Union upon presentation of an appropriate accounting of these expenses.

The Union asks any funds remaining on hand after distribution of monies be tendered to the jointly administered 1199SEIU Home Care Industry Education Fund. It emphasizes that fund exists to educate and train home health care employees.

37

In short, the Union insists its grievance is meritorious. It asks a finding of liability be made against the Employers and an appropriate remedy be awarded to compensate the employees for their losses.

The Employers, on the other hand, argue the Union's grievance lacks merit. They contend the claims presented are lacking in the detail required for wage and hour claims in court actions. The Employers allege accurate time records were kept based upon employees' own timekeeping and the burden for proving violations rests upon the Union.

The Employers argue the employees whose claims are asserted by the Union would not be eligible for class certification were this matter to be heard in court, because, according to the Employers, they are not similarly situated and do not share common issues of law and fact which predominate over individual questions of law or fact. Without class certification, the Employers allege recovery of damages by the employees would be unlikely since the individual nature of their claims would preclude class or collective certification. In these alleged circumstances, they maintain a class action remedy should not be awarded.

38

The Employers contend employee training was given by the Union and the Employers during or after 2015 on procedures for submitting time for work performed on twenty four (24) hour cases. They contend the Union should be estopped from claiming employees did not know to submit time for work performed on those cases during sleep or meal periods. The Employers argue the Union's claims are barred by laches or waiver for not submitting records or claims at an earlier time.

The Employers insist the Union never claimed the terms of its Agreement were not compliant with the WPL and never raised an issue about the WPL until February of 2018 or later, after payments to employees and benefit funds were made and the Employers were reimbursed. They assert no claim was made of a WPL violation until the Union filed its grievance on January 2, 2019. In these alleged circumstances, the Employers insist the Union's WPL claims are barred by laches, waiver and estoppel. They allege all parties understood and believed payment of wage rates negotiated in Collective Bargaining Agreements met the requirements of the WPL. The Employers contend those understandings undermine the Union's claims for relief.

39

The Employers insist they have a defense to the Union's overtime claims under 29 U.S.C. §259, because they acted in good faith reliance upon state and federal regulations, guidance and non-enforcement policies in not paying overtime at the FLSA rate from January to October or November 2015. They allege the Union recognized this defense by providing in the 2015 MOAs Employers are to pay overtime at 1.5 times the employees' regular rates of pay on and after October 13, 2015.

The Employers suggest some lower federal courts were divided on whether the revision of the companionship exemption by the U.S. Department of Labor was effective on January 1, 2015 or on October 13, 2015. They claim an emergency regulation issued by the New York State Department of Labor upheld the validity of not paying home care employees for time spent sleeping and for mealtime.

The Employers contend substantial money judgments would bring about bankruptcies and cripple the home care industry. They insist even if liability is found, I must consider their ability to pay in fashioning an appropriate remedy.

The Employers disclaim any requirement to pay travel time between cases because, in their estimation, the employees were free to accept or decline assignment to a

second client when already serving another client on the same day. They maintain employees' decisions to take on a second client opportunity on the same day as another were voluntary and not a required condition of their employment. In these alleged circumstances, the Employers insist such travel time is not compensable.

The Employers argue even if some of them did not fulfill their legal obligations under the covered statutes, substantial compliance was had with the covered statutes and any violations were isolated and technical in nature. They contend such substantial compliance undermines the Union's request for an award of damages. The Employers insist any acts or omissions on their part were taken in a good faith belief they were complying with the law. In these alleged circumstances, they maintain damages, whether liquidated or otherwise, should not be awarded for any proven violations. The Employers maintain they have made complete and timely payment of all wage payments and minimum wage and overtime payments under the New York Labor Law and are relieved by law from liability for claimed breaches of New York Labor Law §§195(1)(a).

41

The Employers argue any violations committed were not willful and were made in good faith. They contend FLSA claims asserted against them via the Union's January 2, 2019, grievance for periods before January 2, 2017, are time – barred under the two (2) year statute of limitations for non-willful violations. The Employers maintain claims dependent upon the FLSA are subject to statutory defenses including those codified in 29 U.S.C. §§259 and 260.

Without prejudice to the foregoing arguments, the Employers anticipate an award may issue establishing a fund for resolution of the Union's claims. In that event, the Employers propose such fund be allocated, sixty (60%) percent of the pool for 24-hour claims, and forty (40%) percent of the pool for total hours inclusive of 24-hour shifts, with a twenty five (25%) percent enhancement added to 24-hour shifts and total hours prior to December 31, 2015, in calculating the amounts awarded.  The Employers ask any fund established be distributed consistent with equations it submitted.

The Employers argue the cutoff for interrupted live-in shifts should be December 31, 2015. They allege twenty four (24) hour procedures were generally implemented in 2015, but a number of employees had no mechanism to report sleep or

42

rest interruptions in that year, even though the Union advised its members to report work interruptions to their Employers. In the Employers' view, a December 31, 2015, cutoff, gives appropriate recognition to these realities. They claim most overtime issues for twenty four (24) hour and total hour claims occurred from January 1, 2015, to November 2015. The Employers assert their requested cutoff is important as it will allow employees for as many as seven (7) years (2008) to receive a higher amount and will allow every employee who worked 24-hour shifts and other work in 2014 and 2015 to receive premium pay.

The Employers agree the proposed notice and claim form should be attached to and incorporated in my Award. They request any payments from the Claims Administrator to the aides be done agency by agency and not as an aggregated total. The Employers agree with the Union payments should be attributed fifty (50%) percent to wages (inclusive of all required payroll taxes) and fifty (50%) percent as non-wage income, yielding two (2) separate checks for each agency for whom the aide worked during the relevant time period.

One (1) of the Employers, PSC Community Services, Inc. ("PSC"), argues its payment of twenty eight thousand three

43

hundred eighty eight dollars and ninety six ($28,388.96) cents to the New York State Department of Labor to satisfy wage and hour claims for ninety six (96) home health aides for the period June 30, 2013, to April 24, 2016, should be credited against any liability which might be awarded against it in this proceeding. PSC maintains the requested credit covered thirteen (13) hour issues and should be granted to avoid paying twice for the same obligation.

Another of the Employers, Chinese-American Planning Council Home Attendant Program, Inc., argues any claims against it for dates prior to December 27, 2013, are barred and precluded by the doctrines of waiver, release and estoppel, because of a settlement reached with the New York State Department of Labor. It contends in that settlement, entered into on May 7, 2014, all wage and wage notice claims against it were resolved for the period August 25, 2007, through December 27, 2013.

Finally, PSC argues it did a better job than most other Employers in complying with the covered statutes and as a not for profit entity was exempt from overtime pay requirements. In these alleged circumstances, PSC argues a one (1) size fits all, per capita contribution remedy is unfair,

44

prejudicing its interests because it has significantly less damages exposure than other agencies.

In short, the Employers insist the Union's grievance lacks merit. They ask the grievance be denied. In the alternative, should violations of the covered statutes be found, the Employers ask any remedy be within the foregoing parameters.

**Opinion**

Certain preliminary comments are appropriate. As arbitrator, my role is a limited one. It is to interpret the parties' Agreement as written. If the parties' Agreement is clear on its face, and if from the parties' chosen words their intentions are manifest, then I am without power or authority to deviate from those intentions.

With these principles in mind, I turn to the facts presented.

The parties adopted their ADR Article, *supra,* toward the goal of ensuring compliance with the wage and hour provisions of the covered statutes. To that end, they established a grievance procedure for wage and hour claims that includes presentation of class grievances to resolve disputes between

bargaining unit members and their employers over claimed violations of the covered statutes. As arbitrator, my task is to decide this dispute, and to fashion a remedy that fairly compensates employees for wage underpayments or other proven non-compliance with those statutes.

Having carefully and thoroughly examined all evidence and arguments presented, and having fully considered all claims and defenses asserted, I am persuaded required wages were underpaid to these employees, in varying amounts, during the coverage periods at issue. I recognize not all of the Employers violated the covered statutes to the same degree or for the same periods of time, and a few of the Employers had no liability at all for claims made under certain of the covered statutes. Nevertheless, I conclude, in general, violations were committed by all of the Employers during their coverage periods, resulting in underpayment of required wages to the affected home health aides.

My conclusion is supported by the parties' submissions, including their joint stipulation of facts, addenda to the joint stipulation of facts, evidence of the Employers' pay practices, and assertions made during conferences and hearings held during the course of this proceeding. To their credit, the parties have

46

acknowledged the reality violations occurred, and have focused their energies upon how to identify and remediate the extent of those violations in a manner that is fair, appropriate and timely.

Were individual hearings to be held upon each employee's claim, underpayments would be awarded in varying amounts. However, given the volume of claims in this proceeding, I find it is impractical, if not impossible, to schedule and complete an individual hearing on each claim within a reasonable period of time and in a manner that will assure the ability of successful employees to recover the amounts awarded. To illustrate the wisdom of an omnibus determination, doing otherwise would require approximately one thousand (1,000) or more trials to determine precise liability and damages on an individual basis.

Litigating all individual claims would take far more time than the three (3) years this case has already consumed, I find, and would require the expenditure of substantially more legal time and expense, while causing employees to miss work to attend hearings. In the end, such a course could potentially leave employees without meaningful recovery because the costs of extended litigation, on top of damages, could precipitate

Employers potentially going out of business or seeking bankruptcy protection, as has occurred in some corners of the industry. By all accounts, recent trendlines in the home health care industry are threatening its viability. The ongoing pandemic has reduced the census of cases for many agencies and made it difficult to maintain adequate staffing levels, meaning necessary sources of revenue to fund protracted litigation are now particularly unavailable.

Common sense and the interests of arbitral economy favor a remedy which fairly compensates employees for their losses, while avoiding depletion of resources through years of costly, individual hearings. To these ends, this is precisely why the parties adopted binding arbitration to provide a fair and expeditious process for resolving their disputes. By doing so, they have empowered me to fashion a remedy which takes into account conditions in the industry and existing realities affecting the Employers and employees alike.

Accordingly, in this class grievance, I find the Employers have liability for the claims presented, in varying amounts. Considering all of the above factors, and on balance, I shall award a *per capita* contribution remedy which keeps faith with the parties' intentions to achieve compliance with the covered

48

statutes, while providing a mechanism for prompt funding and payment of proven wage claims. Such a remedy is fair to the individual employees, who will benefit by creation of a fund for prompt recovery of claims. Requiring payment of a uniform contribution rate by all of the Employers is appropriate, I find, in the interests of arbitral economy, efficiency and stability of the home care industry.

Although some Employers have argued their exposure to damages on account of the Union's claims is lower than others due to a higher degree of compliance during their coverage period, I am convinced their argument is outweighed by the overarching interest of the Union and all Employers as a whole in maintaining the viability of the industry and its workforce. After all, neither side will benefit from the added costs and delays inherent in having to conduct thousands of individual hearings, at a time when the agencies are facing increased financial pressure from the effects of the pandemic. It makes no sense to issue an award requiring employees wait several more years before their claims are determined and collection of damages can be attempted. Frankly, in these particular circumstances, a *per capita* contribution remedy is the only reasonable course. Moreover, the credit certain individual

49

Employers assert as warranting their more favorable treatment with regard to damages is unavailing.  Under any reasonable view, the amount being required of all Employers is less than what they would face even if their alleged uniqueness was calculated.

Accordingly, the following remedy is awarded, to cover all categories of violations in this proceeding:

1.  A Special Wage Fund (hereinafter, the "Fund") shall be created by contributions from the forty two (42) Employers in this proceeding, who are: 1) ABC Health Services Registry, Inc., 2) AccentCare of NY, Inc., 3) Alliance for Health, Inc., 4) Alliance Home Services, Inc., 5) Azor Home Care, 6) Bronx Jewish Community Council Home Attendant Services, 7) Bushwick Stuyvesant Heights Home Attendants Inc., 8) CABS Home Attendants Service, Inc., 9) Care at Home, 10) Chinese-American Planning Council Home Attendant Program, Inc., 11) CIDNY Independent Living Services, Inc., 12) Cooperative Home Care Associates, 13) Family Home Care of Brooklyn and Queens, 14) FEGS Home Attendant Services, 15) First Chinese Presbyterian Community Affairs Home Attendant Corp., 16) Home Care Services for Independent Living, 17) Home Health Management Services, Inc., 18) New Partners Inc. d/b/a Partners in Care, 19) New York

Foundation For Senior Citizens Home Attendant Services, 20) Personal Touch Home Care of N.Y., Inc., 21) Personal Touch Home Care of Long Island, Inc., 22) Personal Touch Home Care of Westchester, Inc., 23) People Care, Inc., 24) Premier Home Health Services, Inc., 25) Prestige Home Attendant Inc. d/b/a All Season Home Attendant, 26) Prestige Home Care, Inc., 27) Priority Home Care, Inc., 28) PSC Community Services, Inc., 29) RAIN Home Attendant Services, Inc., 30) Region Care, Inc., 31) Richmond Home Needs, 32) Rise Borough Home Care, Inc., 33) RiverSpring Licensed Home Care Services Agency, Inc., 34) Rockaway Home Services, Inc., 35) School Settlement Home Attendant Services Corp., 36) Special Touch Home Care Services, Inc., 37) St. Nicholas Human Support Corp., 38) Stella Orton Home Care Agency, Inc., 39) Sunnyside Citywide Home Care Services, 40) Sunnyside Home Care Project, 41) United Jewish Council of the East Side Home Attendant Service Corp. and 42) The Wartburg Residential Community, Inc. d/b/a No Place Like Home, (collectively, "the Employers").

2. The coverage periods for the Employers are as follows:

Alliance for Health: June 8, 2012 – October 31, 2021

Chinese-American Planning Council Home Attendant Program, Inc.: April 1, 2008 – October 31, 2021

51

First Chinese Presbyterian Community Affairs Home Attendant Corp.: September 2, 2010 – October 31, 2021

New Partners Inc. d/b/a Partners in Care: July 14, 2011 – October 31, 2021

PSC Community Services: July 12, 2012 – October 31, 2021

United Jewish Council of the East Side Home Attendant Service Corp.: June 14, 2011 – October 31, 2021

All other Employers: January 2, 2013 – October 31, 2021.[10]

    3. Within thirty (30) calendar days from issuance of this Award, each of the Employers shall provide to the Claims Administrator ("Administrator") sometimes referred to as "Administrator", appointed below, the following information for each home aide in its employ during its coverage period (except for home aides Alvaro Ramirez Guzman, Elida Agustina Mejia Herrera, Leticia Panama Rivas, Boris Pustilnik, Maral Agarunova, Epifania Hichez, Carmen Carrasco, Seferina Acosta, and Eugenia

---

[10] The parties have agreed upon October 31, 2021, as the end date for all coverage periods in this case. However, as set forth in paragraph no. 3 of this Award, infra, I have ordered each Employer, within fourteen (14) calendar days after issuance of this Award, to provide me with an updated list of the covered employees on its payroll through October 31, 2021, and have further ordered for any Employer which fails to provide me this information, the covered period for that particular Employer will be through October 31, 2019, the date the Employers last provided the number of covered employees. Thus, for those Employers failing to provide the required information, their release shall be for a shorter period.

Barahona Alvarado, whose claims I have excluded from this Award), in Excel format (not PDF) with the following fields in linear form, stating the employee's a) social security number, b) last name, first name and middle initial if available, c) last known residence address, d) last known telephone number, e) last known email, f) for each year employed, total hours worked per year (including all regular, overtime and 24-hour shifts), g) for each year employed, total number of 24-hour shifts worked per year. A copy of the information shall also be provided by each Employer to the Union care of its counsel. All of the above information shall be transmitted by encryption and shall be held in the strictest confidence by the Employers, the Union and the Claims Administrator to be appointed, herein and used only for purposes of this arbitration and implementation of my Award.[11]

4.   Within sixty (60) calendar days after issuance of this Award, each Employer listed above shall contribute the sum of two hundred fifty ($250) dollars for each home aide in its employ during all or part of its coverage period. If an employee worked for more than one (1) Employer, each Employer shall be

---

[11] Within thirty (30) calendar days of this Award, Premier shall submit to me information regarding the number of its employees for the period January 2, 2013 – October 31, 2021.

bound to separately contribute two hundred fifty ($250) dollars for that employee. All contributions shall be paid to the Fund established by the Claims Administrator named below.[12]

I have arrived at this *per capita* contribution amount after considering fully the parties' submissions including employee affidavits submitted by the Union, relevant Employer financial records submitted by virtually all Employers, the level of funding needed to assure fair compensation to the employees, and the financial stability of the industry. My office had the assistance of the CFO of Scheinman Arbitration and Mediation Services so as to fully understand the import of the voluminous financial data submitted.

I am particularly cognizant of the need to avoid serious disruption to the Employers' mission of delivering essential services. Having carefully examined all relevant factors in great detail, I am convinced a *per capita* contribution of two hundred fifty ($250) dollars is the maximum that can be imposed without causing serious disruption and upheaval to a vital service. This is especially so for patients in underserved communities and others whose lives would be thrown into chaos

---

[12] Each Employer's per capita two hundred fifty ($250) dollars contribution shall be reduced by amounts paid on account.

by Employers having to close, file for bankruptcy protection or engage in massive reductions in force if a larger *per capita* contribution were imposed. Balancing all of these factors leads to the inevitable conclusion a *per capita* contribution greater than two hundred fifty ($250) dollars is not sustainable and will, inevitably, lead to deserving employees failing to recover upon their meritorious claims. For all these reasons, I am convinced the *per capita* contribution awarded is correct.[13]

I have also considered the claimed inability of certain of the Employers to fund a substantial award and have reviewed the financial records they submitted. Having done so, I am not persuaded those Employers lack the ability to make the *per capita* contributions awarded, herein, which are discounted from what the Employers might otherwise have to pay if the claims were individually litigated. The home health care industry as a whole will not be threatened, I find, by having to make these

---

[13] I also note unlike most class cases where thirty (30%) percent to forty (40%) percent of a fund is spent on legal fees and expenses, because of the way this matter has proceeded and the willingness of Union counsel to forego legal fees, it appears all of the customary costs, including arbitration fees and administrative fees and expenses, will be satisfied for less than twenty (20%) percent in total. As a result, the class members will wind up with at least eighty (80%) percent of the established Fund being available to pay claims.

55

contributions to resolve the Union's claims. As to the differences of certain Employers being exempt from certain liability because they are non-profit, or have received an exemption from the requirements of the New York's Minimum Wage Order for Miscellaneous Industries and Occupations and have provided a copy of the "statement of Non-Profitmaking Institution" certification to the Union, which establishes the Minimum Wage Order exemption, and that certain Employers have come into compliance more expeditiously, those factors have been considered in determining the required per capita payment. Frankly, even for those Employers asserting these special circumstances, a two hundred fifty ($250) dollars per capita contribution is a significant discount from potential liability.

I have been involved as an arbitrator for more than thirty (30) years in resolution of disputes in the home health care industry. I have also mediated dozens of similar matters in both unionized and non-union settings. Based on these experiences, I am familiar with the outcome of wage and hour and contract disputes. I find the remedy awarded, herein, will provide a Fund of approximately $30 to $35 million from which the covered employees will receive fair compensation, and is consistent with established dispositions in such cases.

56

I reject the Employers' request for an opportunity to make their *per capita* contributions in installments over time. Delaying receipt of contributions to the Fund is unreasonable and unfair to the covered employees who provided valuable services but were underpaid wages. A delayed payment plan is not dictated by the economic demands of this Award.

5. The Fund shall be allocated sixty (60%) percent to 24-hour shift claims and forty (40%) percent to total hours inclusive of 24-hour shifts. A fifteen (15%) percent enhancement shall be added to the 24-hour shifts and total hours for the portion of the coverage period ending December 31, 2015, in calculating the amounts to be paid to the employees. This enhancement is awarded upon my determination the Employers' implementation of 24-hour procedures was spotty before December 31, 2015, resulting in more violations on 24-hour shifts than occurred after that date. I find a fifteen (15%) percent enhancement is appropriate under the proven circumstances. To illustrate, if all of the 24-hour shifts were totaled and were awarded at one (1) point for each 24-hour shift, prior to December 31, 2015, each of those 24-hour shifts would be calculated based upon 1.15.

57

Consistent with the allocations set forth in this Award, a) the formula for distribution of the sixty (60%) percent portion of the Fund allocated to twenty four 24-hour shift claims will be a fraction whose numerator is the number of twenty four (24) hour shifts worked by each covered employee during the coverage period of his or her Employer(s), and whose denominator is the total number of 24-hour shifts worked by all covered employees in the bargaining unit during the coverage periods of all Employers. Said fraction shall be used to arrive at each employee's share of monies to be paid from the said sixty (60%) percent portion of the Fund, by multiplying the said portion of the Fund by the said fraction. b) the formula for distribution of the forty (40%) percent portion of the Fund allocated to total hours worked inclusive of 24-hour shifts will be a fraction whose numerator is the total number of hours worked by each covered employee during the coverage period of his or her Employer(s) inclusive of 24-hour shifts, and whose denominator will be the total number of hours worked inclusive of 24-hour shifts by all covered employees in the bargaining unit during the coverage periods of all Employers. Said fraction shall be used to arrive at each employee's share of monies to be paid to employees from

58

the said forty (40%) percent portion of the Fund by multiplying the said portion of the Fund by the said fraction.

6. For tax purposes, all payments to employees shall be allocated fifty (50%) percent to back wages, with the balance divided between interest and liquidated damages. Payments treated as back wages shall be made net of all applicable employment taxes, including, without limitation, federal, state and local income tax withholding and the employee share of the FICA tax, and shall be reported to the IRS and the payee under the payee's name and social security number on an IRS Form W-2. Payments treated as liquidated damages and interest shall be made without withholding and shall be reported to the IRS and the payee under the payee's name and social security number on an IRS Form 1099. The Claims Administrator shall issue each employee payee's individual settlement amount in the form of two (2) checks: one (1) check for back wages (W-2) and one check for interest and liquidated damages (1099).

7. The Employers and the Claims Administrator shall exchange such information as is necessary for the Claims Administrator to make proper tax withholdings and comply with tax reporting obligations as described herein.

8. The cost of the Claims Administrator, attorneys' fees, arbitration fees, all withholding taxes and the expenses of setting up the necessary hotline shall be deducted from the Fund.

9. The parties acknowledge the Union has performed the vast majority of legal work in prosecuting the grievance. They also agree Wittels Law P.C., was designated in my April 17, 2020, Award, as Plaintiffs' Coordinating Counsel and should receive an attorney's fee award for its service. The parties understand counsel for the Union has advised they will be returning to the Fund any attorneys' fees awarded to them, for disbursement to employees. I also note certain other attorneys also participated in this process, specifically at the arbitration hearing held on January 15, 2020, and thereafter. Therefore, within thirty (30) calendar days of this Award, Union counsel, Plaintiffs' Coordinating Counsel and those individual attorneys may submit their applications for attorneys' fees and expenses, for my determination. Any sums awarded as attorneys' fees shall be disbursed by the Claims Administrator as I shall direct. Except as otherwise provided herein, each party shall bear its own costs and expenses.

10. In the event there are funds remaining on hand after distribution to employees has been made, those funds shall be deposited to the jointly administered 1199SEIU Home Care Industry Education Fund, which is a benefit fund to which all Employers contribute and which operates for the benefit of educating and training home care employees.

11.   Each aide who timely provides a claim form shall receive a minimum payment of ten ($10) dollars, subject to be apportioned fifty (50%) percent to back wages and one fifty (50%) percent to non-wage income.

12. Employees of an Employer who fails to provide data or funding directed by my Award shall not receive payment for the portion of time they worked for such Employer, unless or until the data and funding is received. The Union may seek provisional remedies before me in order to ensure my Award is not ineffectual, by requesting attachment, undertaking, an increased *pro rata* distribution, or such other relief as may be proper to achieve compliance with my Award by such Employer.

13.   At my earlier direction, the parties met and conferred over the form and content of a proposed notice and claim form for the Administrator's use in administering the

61

Fund. They then submitted an agreed upon form, which I have reviewed and hereby approve. I have attached the form to my Award as Exhibit "A" and authorize its use by the Claims Administrator in providing necessary notice to each employee.

14.   The Claims Administrator appointed, herein, shall, within thirty five (35) calendar days after issuance of this Award, establish a website with relevant information, including a set of forms in the following five (5) languages: English, Spanish, Haitian Creole, Chinese, Russian.  A toll-free number shall also be established by the Claims Administrator for use by employees and Employers in contacting the Claim Administrator by telephone.

The Claims Administrator appointed, herein, shall, within sixty (60) calendar days after issuance of this Award, mail the approved Notice and Claim Form to each covered employee. For any Notice and Claim Form returned as undeliverable by the Post Office, the Claims Administrator will conduct no more than two (2) skip traces within two (2) business days of receipt of the returned Notice and Claim Form.

Within sixty (60) calendar days ("bar date") of the date the Notice and Claim Form is mailed to the employees, each

employee must return his or her completed Claim Form to the Claims Administrator appointed, herein.

No later than forty five (45) calendar days after the bar date, the Claims Administrator appointed, herein, shall issue checks to all employees who have submitted a valid claim form.

The Claims Administrator appointed, herein, shall issue a reminder notice to each check recipient, within thirty (30) calendar days after mailing of the check(s), to cash his or her check(s).

Each employee shall have sixty (60) calendar days from the mailing of his or her check(s) to cash his or her check(s).

In the event any checks are returned as undeliverable or not cashed within six (6) months after issuance, the funds on which those checks were written shall be retained by the Claims Administrator to be appointed, herein, for a period of six (6) additional months, in order to be available for employees who demonstrate an acceptable reason for why they did not receive a Notice and claim form, or that they mailed it back but it was not received, or why they never received or cashed a check. Thereafter, any remaining funds on hand with the Claims Administrator shall be disbursed to the jointly administered

63

1199SEIU Home Care Industry Education Fund, in accordance with paragraph no. 10 of this Award.

15.  The parties have selected, and I hereby appoint, Arden Claims Service, LLC, attn.: William Varon, Executive Director of Finance & Operations (email: William.Varon @ArdenClaims.com), as Claims Administrator, with full power and authority to receive the Employers' *per capita* contributions and administer the Fund in accordance with this Award.

16.  The request of PSC Community Services, Inc. for a credit of $28,388.96 against its liability for *per capita* contributions awarded herein, based upon its having earlier paid that amount to the New York State Department of Labor for underpaid wages revealed in an audit for the period June 30, 2013 - April 24, 2016, is denied as I have already discounted the overall contribution rate taking this claim into consideration.

17. The request of Chinese-American Planning Council Home Attendant Program, Inc., for exclusion of liability for claims accruing prior to December 27, 2013, based upon its having earlier entered into a settlement with the New York State Department of Labor resolving all wage and wage notice for the period August 25, 2007, through December 27, 2013, is denied as

64

I have already discounted the overall contribution rate taking this claim into consideration.[14]

18.   In the event issues arise between the parties regarding the administration of the Fund, or the application, or interpretation of this Award, as requested, I shall retain jurisdiction to determine all such issues.

In all, the Union's grievance is sustained to the extent set forth above.

---

[14] To the extent other Employers have argued for reduction of their *per capita* contribution because of claimed prior releases, non - profit exemptions, wage payments and settlements earlier made, I have already discounted the overall contribution rate taking those claims into consideration.

**AWARD**

1.   A Special Wage Fund (hereinafter, the "Fund") shall be created by contributions from the forty two (42)Employers in this proceeding, who are: 1) ABC Health Services Registry, Inc., 2) AccentCare of NY, Inc., 3) Alliance for Health, Inc., 4) Alliance Home Services, Inc., 5) Azor Home Care, 6) Bronx Jewish Community Council Home Attendant Services, 7) Bushwick Stuyvesant Heights Home Attendants Inc., 8) CABS Home Attendants Service, Inc., 9) Care at Home, 10) Chinese-American Planning Council Home Attendant Program, Inc., 11) CIDNY Independent Living Services, Inc., 12) Cooperative Home Care Associates, 13) Family Home Care of Brooklyn and Queens, 14) FEGS Home Attendant Services, 15) First Chinese Presbyterian Community Affairs Home Attendant Corp., 16) Home Care Services for Independent Living, 17) Home Health Management Services, Inc., 18) New Partners Inc. d/b/a Partners in Care, 19) New York Foundation For Senior Citizens Home Attendant Services, 20) Personal Touch Home Care of N.Y., Inc., 21) Personal Touch Home Care of Long Island, Inc., 22) Personal Touch Home Care of Westchester, Inc., 23) People Care, Inc., 24) Premier Home Health Services, Inc., 25) Prestige Home Attendant Inc. d/b/a All Season Home Attendant, 26) Prestige Home Care, Inc., 27) Priority Home Care, Inc., 28) PSC Community Services, Inc., 29) RAIN Home Attendant Services, Inc., 30) Region Care, Inc., 31) Richmond Home Needs, 32) Rise Borough Home Care, Inc., 33) RiverSpring Licensed Home Care Services Agency, Inc., 34) Rockaway Home Services, Inc., 35) School Settlement Home Attendant Services Corp., 36) Special Touch Home Care Services, Inc., 37) St. Nicholas Human Support Corp., 38) Stella Orton Home Care Agency, Inc., 39) Sunnyside Citywide Home Care Services, 40) Sunnyside Home Care Project, 41) United Jewish Council of the East Side Home Attendant Service Corp. and 42) The Wartburg Residential Community, Inc. d/b/a No Place Like Home.

2.   The coverage periods for the Employers are as follows:

    Alliance for Health: June 8, 2012 – October 31, 2021

Chinese-American Planning Council Home Attendant Program, Inc.: April 1, 2008 – October 31, 2021

First Chinese Presbyterian Community Affairs Home Attendant Corp.: September 2, 2010 – October 31, 2021

New Partners Inc. d/b/a Partners in Care: July 14, 2011 – October 31, 2021

PSC Community Services, Inc: July 12, 2012 – October 31, 2021

United Jewish Council of the East Side Home Attendant Service Corp.: June 14, 2011 – October 31, 2021

All other Employers: January 2, 2013 – October 31, 2021

3.   Within thirty (30) calendar days from issues of this Award, each of the Employers shall provide to the Claims Administrator ("Administrator") sometimes referred to as "Administrator", named below, the following information for each home aide in its employ during its coverage period (except for home aides Alvaro Ramirez Guzman, Elida Agustina Mejia Herrera, Leticia Panama Rivas, Boris Pustilnik, Maral Agarunova, Epifania Hichez, Carmen Carrasco, Seferina Acosta, and Eugenia Barahona Alvarado, whose claims are excluded from this Award), in Excel format (not PDF) with the following fields in linear form, stating the employee's a) social security number, b) last name, first name and middle initial if available, c) last known residence address, d) last known telephone number, e) last known email, f) for each year employed, total hours worked per year (including all regular, overtime and 24-hour shifts), g) for each year employed, total number of 24-hour shifts worked per year. A copy of the information shall also be provided by each Employer to the Union care of its counsel. All of the above information shall be transmitted by encryption and shall be held in the strictest confidence by the Employers, the Union and the Claims Administrator to be appointed, herein and

67

used only for purposes of this arbitration and implementation of my Award.

In addition, within fourteen (14) calendar days after issuance of this Award, each Employer shall provide me with an updated list of the covered employees on its payroll through October 31, 2021. Should any Employer fail to provide me this information, the covered period for that particular Employer will be through October 31, 2019, the date the Employers last provided the number of covered employees. Thus, for those Employers failing to provide the required information, their release shall be for a shorter period.

4.    Within sixty (60) calendar days after issuance of this Award, each Employer listed in paragraph 1, above, shall contribute the sum of two hundred fifty ($250) dollars for each home aide in its employ during all or part of its coverage period. If an employee worked for more than one (1) employer, each Employer shall be bound to separately contribute two hundred fifty ($250) dollars for that employee.   All contributions shall be paid to the Claims Administrator named below.

5.    The Fund shall be allocated sixty (60%) percent to 24-hour shift claims and forty (40%) percent to total hours inclusive of 24-hour shifts. A fifteen (15%) percent enhancement shall be added to the 24-hour shifts and total hours for the portion of the coverage period ending December 31, 2015, in calculating the amounts to be paid to the employees.

Consistent with the allocations set forth in this Award, a) the formula for distribution of the sixty (60%) percent portion of the Fund allocated to 24-hour shift claims will be a fraction whose numerator is the number of 24-hour shifts worked by each covered employee during the coverage period of his or her Employer(s), and whose denominator is the total number of 24-hour shifts worked by all covered employees in the bargaining unit during the coverage periods of all Employers. Said fraction shall be used to arrive at each employee's share of monies to be paid from

68

the said sixty (60%) percent portion of the Fund, by multiplying the said portion of the Fund by the said fraction. b) the formula for distribution of the forty (40%) percent portion of the Fund allocated to total hours worked inclusive of 24-hour shifts will be a fraction whose numerator is the total number of hours worked by each covered employee during the coverage period of his or her Employer(s) inclusive of 24-hour shifts, and whose denominator will be the total number of hours worked inclusive of 24-hour shifts by all covered employees in the bargaining unit during the coverage periods of all Employers. Said fraction shall be used to arrive at each employee's share of monies to be paid to employees from the said forty (40%) percent portion of the Fund by multiplying the said portion of the Fund by the said fraction.

6.     For tax purposes, all payments to employees shall be allocated fifty (50%) percent to back wages, with the balance divided between interest and liquidated damages. Payments treated as back wages shall be made net of all applicable employment taxes, including, without limitation, federal, state and local income tax withholding and the employee share of the FICA tax, and shall be reported to the IRS and the payee under the payee's name and social security number on an IRS Form W-2. Payments treated as liquidated damages and interest shall be made without withholding and shall be reported to the IRS and the payee under the payee's name and social security number on an IRS Form 1099. The payees shall be responsible for any applicable taxes associated with payments treated as liquidated damages and interest. The Claims Administrator shall issue each employee payee's individual settlement amount in the form of two (2) checks: one (1) check for back wages (W-2) and one (1) check for interest and liquidated damages (1099).

7.     The Employers and the Claims Administrator shall exchange such information as is necessary for the Claims Administrator to make proper tax withholdings and comply with tax reporting obligations as described herein.

8.  The cost of the Claims Administrator, attorneys' fees, arbitration fees, all withholding taxes and the expenses of setting up the necessary hotline shall be deducted from the Fund.  Within thirty (30) calendar days of this Award, Union counsel and Plaintiffs' Coordinating Counsel may submit their applications for attorneys' fees and expenses, for my determination.  Any sums awarded as attorneys' fees shall be disbursed by the Claims Administrator as I shall direct and deducted from the Fund. I grant the Union's request for an allocation of up to sixty thousand ($60,000) dollars to establish and staff a hotline to answer questions from employees regarding this Award.

Except as otherwise provided herein, each party shall bear its own costs and expenses.

9.  Within thirty (30) calendar days of this Award, Union counsel, Plaintiffs' Coordinating Counsel and certain individual attorneys as described in number 9 of my Opinion, may submit their applications for attorneys' fees and expenses, for determination by the arbitrator. Any sums awarded as attorneys' fees shall be disbursed by the Claims Administrator as the arbitrator shall direct.  Except as otherwise provided in this Award, each party shall bear its own costs and expenses.

10.  Any monies remaining in the Fund after distribution to employees has been made shall be deposited to the jointly administered 1199SEIU Home Care Industry Education Fund.

11.  Each aide who timely provides a claim for shall receive a minimum of ten ($10) dollars, subject to be apportioned fifty (50%) percent to back wages and fifty (50%) percent to non-wage income.

12.  Employees of an Employer who fails to provide data or funding directed by my Award shall not receive payment for the portion of time they worked for such Employer, unless or until the data and funding is received. The Union may seek provisional remedies before me in order

70

to ensure my Award is not ineffectual, by requesting attachment, undertaking, an increased *pro rata* distribution, or such other relief as may be proper to achieve compliance with my Award by such Employer.

13. The notice and claim form attached to this Award as exhibit A is approved for use by the Administrator.

14. The Claims Administrator appointed, herein, shall, within thirty five (35) calendar days after issuance of this Award, establish a website with relevant information, including a set for forms in the following five (5) languages: English, Spanish, Haitian Creole, Chinese, Russian. A toll-free number shall also be established by the Claims Administrator for use by employees and Employers in contacting the Claims Administrator by telephone.

The Claims Administrator appointed, herein, shall, within sixty (60) calendar days after issuance of this Award, mail the approved Notice and Claim Form to each covered employee. For any Notice and Claim Form returned as undeliverable by the Post Office, the Claims Administrator will conduct no more than two (2) skip traces within two (2) business days of receipt of the returned Notice and Claim Form.

Within sixty (60) calendar days ("bar date") of the date the Notice and Claim Form is mailed to the employees, each employee must return his or her completed Claim Form to the Claims Administrator appointed, herein.

No later than forty five (45) calendar days after the bar date, the Claims Administrator appointed, herein, shall issue checks to all employees who have submitted a valid claim form.

The Claims Administrator appointed, herein, shall issue a reminder notice to each check recipient, within thirty (30) calendar days after mailing of the check(s), to cash his or her check(s).

71

Each employee shall have sixty (60) calendar days from the mailing of his or her check(s) to cash his or her check(s).

In the event any checks are returned as undeliverable or not cashed within six (6) months after issuance, the funds on which those checks were written shall be retained by the Claims Administrator to be appointed, herein, for a period of six (6) additional months, in order to be available for employees who demonstrate an acceptable reason for why they did not receive a Notice and claim form, or that they mailed it back but it was not received, or why they never received or cashed a check. Thereafter, any remaining funds on hand with the Claims Administrator shall be disbursed to the jointly administered 1199SEIU Home Care Industry Education Fund, in accordance with paragraph no. 10 of this Award.

15. The parties have selected, and I hereby appoint, Arden Claims Service, LLC, as Claims Administrator, with full power and authority to receive the Employers' *per capita* contributions and administer the Fund in accordance with this Award.

16. The request of PSC Community Services, Inc. for a credit of $28,388.96 against its liability for *per capita* contributions awarded herein, based upon its having earlier paid that amount to the New York State Department of Labor for underpaid wages revealed in an audit for the period June 30, 2013 – April 24, 2016, is denied.

17. The request of Chinese-American Planning Council Home Attendant Program, Inc. for exclusion of liability for claims accruing prior to December 27, 2013, based upon its having earlier entered into a settlement with the New York State Department of Labor, is denied.

18. In the event issues arise between the parties regarding the administration of the Fund, or the application, or interpretation of this Award, as requested, I shall retain jurisdiction to determine all such issues.

72

19.  The Union's grievance is sustained to the extent set
     forth in my Opinion, above.

February 25, 2022.

_____
Martin F. Scheinman, Esq.
Arbitrator


STATE OF NEW YORK      )
                       )   ss.:
COUNTY OF NASSAU       )


I, MARTIN F. SCHEINMAN, ESQ., do hereby affirm upon my

oath as Arbitrator that I am the individual described

herein and who executed this instrument, which is my Award.

February 25, 2022.

_____
Martin F. Scheinman, Esq.
Arbitrator

Home Health Care Agencies.1199.class action grievance.awd

73

# EXHIBIT A

NOTICE OF HOME HEALTH AIDE INDUSTRY WIDE ARBITRATION AWARD and MEMBER CLAIM
FORM AND RELEASE ("NOTICE")

TO:         Current and Former Bargaining Unit Members of 1199 SEIU United Health Care Workers East
            ("Bargaining Unit Members") who are entitled to payments pursuant to an Arbitration Award, as
            described below

FROM:       1199 SEIU United Healthcare Workers East, by Order of the Arbitrator

DATED:      _____, 2021

## PLEASE READ THIS NOTICE CAREFULLY

## YOU MUST SEND IN THE ENCLOSED FORM BY _____

**This Notice relates to an Award issued pursuant to your collective bargaining agreement between 1199 and
your Employer(s) by a neutral Arbitrator (the "Award"). It contains important information about your
right to receive a payment provided for by the Award, and explains how you may receive a payment. You
must submit a claim form in order to receive a payment. The Frequently Asked Questions ("FAQs")
attached to this Notice are an important part of the Notice and provide very important information about
your rights and participation in the Award. Please read the FAQs carefully.**

On January 2, 2019, 1199 SEIU United Healthcare Workers East ("1199 Union") filed a grievance (the
"Grievance") on behalf of current and former 1199 Union Bargaining Unit Members against forty-two (42) home
health care agencies ("Employers") with Collective Bargaining Agreements ("CBAs") with the 1199 Union.[1]
1199's Grievance covered claims that Employers did not pay employees certain required wages including
interruptions to rest and meal breaks on 24-hour cases, overtime pay from January 1, 2015-October 12, 2015,
spread of hours pay, and travel time pay, and a claim that the Employers did not provide employees with proper
pay notices and paystubs ("Covered Claims"). The Arbitrator decided all of the Covered Claims at issue in the
Arbitration.[2]

The Grievance was heard by the Arbitrator pursuant to the CBAs. On [date of Award], the Arbitrator issued an
Award. The Arbitrator found that the 1199 Union had established  claims for wages and damages on behalf of
Bargaining Unit Members. The Arbitrator's Award directed the forty-two (42) Employers to make payments in
the total amount of approximately [$35,000,000] to a special wage fund (the "Special Wage Fund"), from which
payments will be made to eligible home health aides who timely submit a claim. The Special Wage Fund will not
only pay wages and damages to eligible Bargaining Unit Members, but also will cover the costs associated with
the Arbitration, administration of the Fund (including withholding certain tax amounts), and attorneys' fees to the
attorneys who represented the 1199 Union as well as other attorneys acting as liaison counsel in the Arbitration.
Although the 1199 Union's lawyers were the primary attorneys and spent the bulk of legal time on this Arbitration,
the 1199 Union will waive its share of attorneys' fees, which shall remain in the Special Wage Fund to be
distributed to its Bargaining Unit Members.

You are receiving this Notice because you are eligible for a payment from the Special Wage Fund if you submit
a Claim Form by the deadline. Eligible Bargaining Unit Members are those who worked for at least one of the
forty-two (42) Employers during a certain period of time (the "Coverage Period"). The Coverage Period varies
by Employer. Please see FAQ #10 for the Coverage Period applicable to each Employer. In all instances, the

---

[1]     See FAQ #10 below for a list of the Employers named in the grievance.
[2]     See FAQ #2 below for a list of all of the claims covered by the Arbitration and Award.

Coverage Period ends on October 31, 2021, meaning that the Award covers all claims for unpaid wages and other damages against the Employers that arose before October 31, 2021.  In order to receive a payment from the Special Wage Fund, you must complete, sign and return the attached Claim Form within 60 days of the date of this Notice.

**<u>Sending in the attached claim form to the Special Wage Fund will be your only opportunity to receive payment for the 1199 Union's wage and hour claims that were decided by Arbitrator Martin F. Scheinman.</u>**

**Please read this Notice carefully.**  If you have questions regarding the Arbitrator's Award, this Notice, or the Claim Form, please see the answers to FAQ #8 and FAQ #9 below about who to contact. There is a Claims Administrator which is an independent organization that will be responsible for distributing monies from the Special Wage Fund to eligible Bargaining Unit Members.  Additional information may be available on the Claims Administrator website:_____,

\\NY - 038170/000002 - 10389844 v6

## YOUR RIGHTS PURSUANT TO THE ARBITRATOR'S AWARD:

**You are entitled to receive a portion of the Special Wage Fund that was created pursuant to the Arbitrator's Award.  To receive your portion of the Special Wage Fund, you <u>must</u> complete the Claim Form that is attached to this Notice. Follow the instructions below:**

1.  Complete the Claim Form, which is attached.
    - Fill out the form completely.
    - Be sure to review the address and other contact information and, if anything is incorrect, please correct it, including by providing any updated address.
    - Be sure to provide your phone number and email address. You are responsible for keeping your contact information updated with the Claims Administrator.

2.  Sign and date the Claim Form.

3.  Keep a copy of the Claim Form for your records.

4.  Mail, fax, or e-mail the Claim Form to the Claims Administrator who is responsible for processing Claim Forms and distributing monies from the Special Wage Fund.  Send the completed form to one of the following:

    > **Mail:**
    > **Fax:**
    > **E-mail:**

5.  Make sure your Claim Form is post-marked or received by the Claims Administrator no later than sixty (60) days from the date of this Notice or [DATE].

6.  By signing a Claim Form, you are releasing all of the Employers that you worked for who are covered by the Arbitrator's Award from all Covered Claims that have been or could have been asserted by the 1199 Union on behalf of Bargaining Unit Members that arose or may have arisen up to and including October 31, 2021.

**If you do not submit a Claim Form by 60 days from the date of this notice or [DATE], you will not receive any portion of the monies from the Special Wage Fund awarded by the Arbitrator.**

\\NY - 038170/000002 - 10369844.v6

## CLAIM FORM AND RELEASE INSTRUCTIONS

**In order to receive any portion of the Arbitrator's Award described in the Notice of Home Health Aide Industry Wide Arbitration Award ("Notice"), you must sign, date, and return this Claim Form and Release to the Settlement Claims Administrator by mail, fax, or e-mail no later than sixty (60) days from the date of the Notice:**

[Settlement Claims Administrator]
----
----
Telephone: ----
Fax: ------
Email: -----

## ADDRESS AND CONTACT INFORMATION

«Barcode»    «BarcodeString»                 Name/Address Changes:
SIMID «SIMID»
«FirstName» «LastName»
«Address1» «Address2»
«City» «State»  «Zip»

It **is your responsibility** to keep a current address on file with the Claims Administrator.  Please make sure to notify the Claims Administrator of any change of address.  Additionally, it is **your responsibility** to keep a current phone number and email address on file. Please insert such information below:

Phone number: (_____) _____    Social Security Number: _____

Name: _____    Email Address: _____

### RELEASE

I understand that by submitting a Claim Form, I release my Employers and their owners, stockholders, predecessors, successors, assigns, agents, directors, officers, employees, representatives, attorneys, insurers, reinsurers, parents, subsidiaries, affiliates, benefit plans, plan fiduciaries, and/or administrators, and all persons acting by, through, under or in concert with any of them ("Releasees"), from any claim that was or could have been asserted by me, or by the 1199 Union on my behalf either in the Arbitration or at any other time, based on facts or circumstances that occurred prior to September 30, 2021.  The claims I am releasing include any and all claims under the 1199 Union collective bargaining agreement, the Fair Labor Standards Act, the New York Home Care Worker Wage Parity Law, the New York Labor Law, and any other claims under theories of contract, tort, third party beneficiary and other liability.

I sign this Claim Form and Release knowingly and voluntarily and having read carefully the Notice of Home Health Industry Wide Arbitration Award that I received along with this Release.  I have had the opportunity, if I wished, to consult with the 1199 Union or with counsel before signing this Release.

_____
Name Printed

_____          _____
Date                                                        Signature

\\NY - 038170/000002 - 10389844 v6

## **FREQUENTLY ASKED QUESTIONS**

**Question 1.    Why did I receive this Notice?**

You received this notice because you are a current or former bargaining unit member ("Bargaining Unit Member") of the 1199 Union, represented by the Union in an Arbitration the Union brought on behalf of you and others who work or worked for one of the home health care agencies that participated in the Arbitration. In connection with the Arbitration, the Arbitrator issued an Award requiring your current and/or former Employer(s) to pay money into a Special Wage Fund, and you are eligible for a payment from that Special Wage Fund. The Arbitrator ordered that this Notice and Claim Form be sent to you so that you can receive your portion of the Special Wage Fund. This Notice explains the claims asserted on your behalf by the Union in the Arbitration and your right to receive monies as directed by the Arbitrator in the Award.

**Question 2.    What was the Arbitration about?**

The Covered Claims in Arbitration and encompassed by the Arbitrator's Award include: (a) claims under the Fair Labor Standards Act, New York Home Care Worker Wage Parity Law, New York Labor Law and/or any other applicable federal, state or local wage and hour law, regulation or ordinance (referred to in the Collective Bargaining Agreements ("CBAs") as the "Covered Statutes"); and (b) all other claims by which employees allege they are harmed as a result of their employment with the Employer, including, but not limited to, by failing to pay minimum wage, overtime pay, spread of hours pay, pay for interruptions on 24-hour cases, travel time pay, uniform and laundering expenses, pay for time spent in mandatory orientation and training, unlawful deductions from wages, failing to provide requisite statutory notices, breach of contract with governmental agencies to pay prevailing rates of wages and benefits as required by NY Public Health Law §3614-c, breach of City Service Contracts under NYC Admin. Code § 6-109, any third party beneficiary claims, all tort claims, and all claims of unjust enrichment ("Covered Claims").

The 1199 Union presented evidence that the Employers did not comply with the CBA and/or were liable for other Covered Claims. The 1199 Union submitted evidence that certain home health aides did not always receive wages to which they were entitled, including home health aides who were assigned to 24-hour cases and did not always receive their required uninterrupted meal and rest breaks. The 1199 Union did not prevail on all of its claims, as the Arbitrator was also presented with evidence from Employers regarding their pay practices and their compliance with the CBA and other Covered Claims, as well as other legal and factual defenses to the Covered Claims.

**Question 3.    What did the Arbitrator Award?**

The Arbitrator awarded wages and damages to be paid to home health aides who worked for one or more of the forty-two (42) Employers based on the number of hours they worked, and the number of 24-hour shifts they worked during the Coverage Period. The Arbitrator ordered all of the Employers to pay monies into a Special Wage Fund based on the number of aides employed by each of the Employers during the Coverage Period. The Arbitrator ordered that this Notice and Consent Form be sent to all Bargaining Unit Members of the 1199 Union covered by the Award and established a formula for the distribution of the Special Wage Fund based on the number of 24 hour shifts worked and the total number of hours worked by each aide during the Coverage Period.

**Question 4. Do I Have to Submit a Claim Form?**

Yes, you must submit the attached Claim Form in order to get a payment from the Special Wage Fund.

\WNY - 038170/000002 - 10985844 v6

**Question 5.   How much will I get paid if I submit a claim form?**

The Award allocates monies to Bargaining Unit Members covered by the Grievance based on a formula whereby aides receive a payment based on (a) the number of 24-hour shifts they worked during the applicable Coverage Period (if applicable) and (b) the total number of hours they worked during the applicable Coverage Period. The amount you will receive will be greater for those who worked hours and/or 24 hour shifts before December 31, 20__ than after that date to October 31, 2021. The amount you receive will depend not only on the number of hours and/or number of 24-hour shifts that you worked, but also on the number of Bargaining Unit Members who timely submit claim forms. The total amount available to home health aides in the Special Wage Fund is approximately [$35,000,000], less the amounts paid for the Arbitrator, claims administration and attorneys' fees (though the fees awarded to 1199 have been returned to the Special Wage Fund by the Union).

**Question 6.   Can I decline to file a claim and pursue my claims elsewhere?**

No, pursuant to your collective bargaining agreement and the Award your claims have already been decided and ruled on by the Arbitrator. In order to receive payment for your claims, you will be required to acknowledge this release of claims, which is included on the Claim Form and will also be on the check you receive once you submit a claim form. If you submit a Claim Form, you will release the Employers for which you worked for all Covered Claims that have been brought or that could have been brought by you or on your behalf during the applicable Coverage Period.

If you have any questions about the Release or what it means, please contact [1199 CONTACT].

**Question 7.   What happens if I do not submit the Claim Form or do not do so in a timely matter?**

If you do not timely submit the Claim Form, you will not be eligible for a payment from the Special Wage Fund. Please also be advised that even if you do not submit a Claim Form, the Award precludes you from seeking relief, either on your own or through the 1199 Union, beyond what is provided for in the Award for any Covered Claims, as the Award provides complete relief for all Bargaining Unit Members covered by the Award.

**Question 8.   I have questions about the Arbitration. Where can I obtain more information?**
If you have questions about the Arbitration or Award you can contact [fill in 1199 designated contact]

**Question 9.   I have questions about the Claim Form. Where can I obtain more information?**
If you have questions about the Claim Form you can contact [fill in Claims Administrator designated contact]

**Question 10.  Which are the 42 home health agency employers named in the grievance who are required to contribute to the Fund created by the Arbitrator's Award, and what is the applicable Coverage Period for each employer?**
[Employer names and coverage periods to be inserted]

\WW - 038170/000002 - 10189844 v6